OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.
SENIOR CITIZENS COALITION ET AL., APPELLANTS, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.
CITY OF CLEVELAND, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Consumers' Counsel v. Pub. Util. Comm. (1981),
67 Ohio St. 2d 153.]

(Nos. 80-1480, 80-1528 & 80-1547—
Decided July 15, 1981.)

*Mr. William A. Spratley,* consumers' counsel, *Mr. Gary M. Petroff* and *Ms. Gretchen J. Hummel,* for appellant Consumers' Counsel.

*Mr. Joseph P. Meissner,* for appellants Senior Citizens Coalition *et al.*

*Mr. Thomas E. Wagner,* director of law, and *Mr. Craig A. Glazer,* for appellant city of Cleveland.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. David M. Neubauer,* for appellee Public Utilities Commission.

*Mr. Alan D. Wright, Mr. Craig I. Smith, Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann, Mr. Lowell L. Garrett, Mr. William C. Donahue* and *Mr. Richard W. McLaren, Jr.,* for intervenor-appellee The Cleveland Electric Illuminating Co.

SWEENEY, J.    The scope of this court's review of commis-

sion orders is set forth in R. C. 4903.13, which states in pertinent part:

"A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

"Under the 'unlawful or unreasonable' standard specified in R. C. 4903.13, this court will not reverse or modify an opinion and order of the Public Utilities Commission where the record contains sufficient probative evidence to show that the commission's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty," *Columbus* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 103, 104. See, also, *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 110; *Ohio Utilities Co.* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 153, 164; *Duff* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 367, 370; *General Motors Corp.* v. *Pub. Util. Comm.* (1976), 47 Ohio St. 2d 58, paragraph two of the syllabus; *Cleveland Electric Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, paragraph eight of the syllabus. We assess the appellants' objections with this standard of review in mind.

## I A.

In its order the commission allowed approximately $91 million to be included in the rate base for construction work in progress (CWIP) pursuant to R. C. 4909.15(A)(1) and 4909.15(E). R. C. 4909.15(A)(1) states in relevant part:

"***The commission may, in its discretion, permit a reasonable allowance for construction work in progress but, in no event, may any allowance for construction work in progress be made by the commission until it has determined, after a physical inspection, that the particular construction project is at least seventy-five per cent complete."

R. C. 4909.15(E) imposes the following limitation on allowable CWIP:

"In no event shall an allowance for construction work in progress under division (A)(1) of this section exceed twenty per cent of the total valuation as stated in such division, not including such allowance."

Some $90 million of the CWIP allowance was directly attributable to the Bruce Mansfield coal-fired generating station, which came on line several months after the new rates became effective. It is unquestioned that Bruce Mansfield met the 75 percent completion criterion for rate base eligibility pursuant to R. C. 4909.15(A)(1). Moreover, it is uncontroverted that inclusion of the Bruce Mansfield-related CWIP did not exceed the 20 percent of total valuation limitation imposed by R. C. 4909.15(E).

## I A(i).

Appellants Senior Citizens Coalition et al. (hereinafter "SCC"), in case No. 80-1528, challenge the commission's allowance for CWIP in this case on the basis that the CWIP provisions contained in R. C. 4909.15(A)(1) represent an unconstitutional delegation of legislative power. Specifically, SCC contends that the statute "***establishes no definite policy nor provides any standard for the exercise of PUCO discretion in permitting an allowance for construction work in progress and***therefore the PUCO should be prohibited from granting any such allowance.***"

We find no merit in SCC's constitutional challenge to the CWIP provisions because the commission's discretion is sufficiently circumscribed by the specific eligibility criteria enumerated in the statute. As we stated in *Consumers' Counsel* v. *Pub. Util. Comm., supra* (58 Ohio St. 2d 108), at page 113:

"***We believe these limitations adequately confine commission discretion. Further restriction would conceivably hinder the flexibility necessary to enable the commission to carry out legislative will. For these reasons, this court holds that the discretion granted the commission under R. C. 4909.15 to authorize a reasonable allowance for construction work in progress in a utility's rate base constitutes a lawful delegation of the state's police power by the General Assembly."

We expressed the same view of the CWIP provisions of R. C. 4909.15(A)(1) in *Cleveland* v. *Pub. Util. Comm.* (1980), 63 Ohio St. 2d 62, 68. In the case at bar we decline to strike down the CWIP statute as an unconstitutional delegation of legislative authority.

### I A (ii).

Both SCC and appellant city of Cleveland, in case No. 80-1547, contend that the inclusion of a CWIP allowance in this case constituted an abuse of commission discretion. As previously noted, the Bruce Mansfield generating station, which accounted for virtually all of the CWIP at issue, met the 75 percent completion criterion and came on line several months after the new rates went into effect. Under these circumstances we cannot say that the commission's decision was either manifestly against the weight of the evidence or unsupported by the record. *Columbus* v. *Pub. Util. Comm., supra.* Therefore, we refuse to disturb the commission's findings on the propriety of including a CWIP allowance in CEI's rate base. Accordingly, we reject appellants' assertions that the commission abused its discretion in granting the CWIP allowance.

### II.

SCC alleges that the commission did not adequately investigate CEI's generating capacity to determine whether the utility had excess capacity. The commission staff investigated CEI's generating capacity and determined that the reserve capacity was adequate but not excessive.[4] Staff and CEI witnesses testified to the same effect at the hearings before the commission wherein they explained the methodology by which they reached their conclusions.

We have in a previous case acknowledged the difficulties the commission and utilities face on the excess capacity issue. "*** Since utilities must anticipate load growth years in advance to maintain adequate capacity to ensure reliable service, it is unrealistic to expect a utility to have only the precise amount of capacity needed at a given time." *Cleveland* v. *Pub. Util. Comm., supra,* at 65. To paraphrase what we stated in *Consumers' Counsel* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 71, 79: Limited judicial review of an excess capacity determination is sound for the reason that while excess capacity analyses have an aura of precision about them, they are fraught with judgments and assumptions. Given the inherent

---

[4] The record indicates that CEI had available 3,469 megawatts (MW) of capacity. The 1979 peak load was 3,097 MW and the forecasted 1980 peak load was 3,450 MW.

problems of accurately projecting load growth, we are satisfied that the commission's excess capacity methodology is reasonable and that the factual findings are supported by the record. SCC's challenge on the question of excess capacity is, therefore, without merit.

### III A.

Before proceeding to the merits of appellants' contentions on the question of whether the commission lawfully and reasonably treated the four cancelled nuclear power plants as amortizable costs, we must first consider two procedural issues raised by appellant Cleveland in case No. 80-1547. Cleveland first contends that CEI violated the notice provisions of R. C. 4909.18 and 4909.19. R. C. 4909.18(E) requires that "[a] proposed notice for newspaper publication fully disclosing the substance of the application" must accompany the rate increase application. R. C. 4909.19 requires the applicant to publish in newspapers of general circulation the "substance and prayer of its application."[5] Cleveland asserts that CEI's proposed notice under R. C. 4909.18 and its published notice under R. C. 4909.19 were inadequate because no mention was made of the four terminated nuclear units in either notice.

Cleveland relies on *Committee Against MRT* v. *Pub. Util. Comm.* (1977), 52 Ohio St. 2d 231, and *Ohio Assn. of Realtors* v. *Pub. Util. Comm.* (1978), 60 Ohio St. 2d 172, to support its contention that CEI's statutory notices were inadequate. In *MRT, supra,* we stated, at page 233, that "***a highly innovative and material change in the *method of charging* customers should be included in the notice." (Emphasis added.) The cancelled power plant information that Cleveland insists should have been included in the CEI notices herein complained of did not relate to an innovative method of charging that would profoundly affect the rates paid by certain categories of utility customers. Therefore, Cleveland's reliance on *MRT* and *Realtors* is misplaced.

---

[5] Appellees challenge Cleveland's standing to complain of the allegedly flawed notices. The standing question, however, was not raised before the commission and, therefore, according to our well-settled rule, the issue is not properly before this court. *Stores Realty Co.* v. *Cleveland* (1975), 41 Ohio St. 2d 41, 43.

The proposed notice under R. C. 4909.18(E) need only convey the "substance" of the application and the notice published pursuant to R. C. 4909.19 need only contain the "substance and prayer" of the application. The decision of the CAPCO companies to terminate the proposed plants did not alter the "substance" or the "substance and prayer" of CEI's application because CEI did not request additional rate relief when it revised its original application to reflect the terminated plant expenditures. We hold that the CEI notices met the standards of R. C. 4909.18 and 4909.19, and consequently Cleveland's assertions to the contrary are unfounded.

### III B.

Cleveland's second procedural objection relates to the adequacy of the staff investigation and report in regard to the cancelled nuclear power plants. R. C. 4909.19 requires that the commission investigate and issue a report on rate increase applications. The commission did conduct an investigation and prepared a report on the original CEI application. As noted however, the initial commission staff report was silent on the subject of the terminated plants because the decision to cancel the plants was announced too late to be included in the report. However, the staff did subsequently investigate the matter of the terminated facilities and assessed the effect of the cancelled generating stations on CEI's pending rate application. Cleveland now complains that the omission of these matters from the original report and the tardy presentation of the staff review of the four terminated plants after hearings on the application had already begun were prejudicial and in violation of R. C. 4909.19. Cleveland asserts that "intervenors have been consistently denied the opportunity to adequately prepare their case. They have [had] no opportunity to review the Staff's findings prior to hearings and thus no opportunity to prepare evidence to support or rebut the same."

Notwithstanding these contentions, Cleveland, after posing objections to the original report, did receive the benefits of the staff's investigation of the four terminated nuclear plants and had ample opportunity to cross-examine the commission's and CEI's experts at the public hearings. Cleveland did not seek additional time to prepare its case while these matters were pending before the commission. Moreover, Cleveland

had already intervened in the case before the plant closing issue surfaced and therefore was not prejudiced by the omission of the cancelled plant data in the original report. *Worthington Hills Civic Assn.* v. *Pub. Util. Comm.* (1976), 45 Ohio St. 2d 11.

The purpose of the staff report is "***to facilitate meaningful contest of rate increase applications by providing interested parties with the materials necessary for an informed challenge." *Duff* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 367, 376. The commission report in this case, as supplemented by the follow-up investigation conducted by the commission staff, provided appellant Cleveland with the opportunity to make an informed challenge. Therefore, the commission's investigation and report in the instant rate application case comply with the statutory requirements set forth in R. C. 4909.19.

## IV A.

The core issue in each of these appeals is whether the commission lawfully and reasonably permitted CEI to treat its investment in the four cancelled nuclear generating stations as amortizable costs.

The commission order stated and analyzed the question in this fashion:

"***What the company seeks is the recovery of costs incurred on behalf of its ratepayers to assure that adequate service could be maintained***. The significant question, given the Commission's past pronouncements with respect to the impropriety of the recovery of past losses through future rates, is whether the amortization of these extraordinary costs does violence to this principle. The distinguishing feature that sets this adjustment apart from those we have rejected on this ground in the past is that costs associated with the termination of the units did not really become costs until the fact of termination. Cancellation does not create a past loss, but gives rise to a current cost.***[R]ejection of this adjustment would have a very direct impact on applicant's financial performance as, in the absence of funding of the amortization through rates, applicant would be required to write off these costs currently***. Thus, we now see the wisdom of the standard emerging from the cases from other jurisdictions; if the expenditures are prudent, amortization should be permitted.

"In determining whether these expenditures were prudent, one must bear in mind what is and what is not at issue. No one disputes that the 1973 decision to embark on the construction in question was reasonable as it was based on the best data available***. Similarly, no one disputes that the decision to terminate construction was reasonable, given the intervening decline in growth expectations and the uncertainties which now attend the construction of nuclear units.***The Commission finds that applicant's decisions were reasonable and prudent at every step of this process, and concludes that the proposed adjustment should be approved."

The appellants argue that the commission exceeded its authority and disregarded a carefully crafted statutory scheme when it acceded to CEI's request to amortize the cancelled nuclear plant expenditures.

There is no question but that the overwhelming weight of authority from other jurisdictions supports the position of the commission.[6] In only two instances has amortization been disallowed.[7] It is important to note, however, that none of the previous rulings on this precise issue represents the opinion of the highest court of the jurisdiction in which the case arose. Virtually all of the decisions that the commission, CEI, and the *amici* cite in support of amortization derive from regulatory proceedings. Even more significant is the fact that no other case has considered the propriety of the commission's proposed amortization with reference to Ohio law. Thus, while counsel for the parties and intervenors before the court in this cause have thoroughly canvassed the administrative decisions

[6] See, *e.g., Re San Diego Gas & Electric Co.* (Cal. Pub. Util. Comm. 1979), 29 P.U.R. 4th 613; *Re Potomac Electric Power Co.* (Md. Pub. Ser. Comm. 1977), Order No. 6999; *Re Consumer Power Co.* (Mich. Pub. Ser. Comm. 1975), Case No. F-700; *Re Northern States Power Co.* (Minn. Pub. Ser. Comm. 1977), Dkt. E-0021 GR-76-934; *Re Public Service Electric and Gas Co.* (N.J. Dept. of Energy, Bd. of Pub. Util. 1980), Dkt. No. 794-310; *Re Carolina Power & Light Co.* (N.C. Util. Comm. 1979), Dkt. No. E-2, Sub. 352; *Re Gulf States Utilities Co.* (Pub. Util. Comm. of Texas 1979), Dkt. No. 2677; *Re Virginia Electric & Power Co.* (Va. Corp. Comm. 1979), 29 P.U.R. 4th 65; *Re Wisconsin Electric & Power Co.* (Pub. Ser. Comm. of Wis. 1980), Dkt. N. 05-CE-3; *Re Potomac Electric Power Co.* (D.C. Pub. Ser. Comm. 1979), 29 P.U.R. 4th 517.

[7] See *Re Arizona Public Service Co.* (Ariz. Corp. Comm. 1980), Decision No. 51009; *Re Northern States Power Co.* (Pub. Ser. Comm. of N.D. 1980), Case No. 10,097.

in other jurisdictions and have supplied this court with copies of those decisions, we must regard these foreign regulatory opinions as advisory in nature. The construction of Ohio law is particularly the province of this court, and we are nowise bound by the pronouncements of regulatory regimes elsewhere in effect.

### IV B.

The commission's approval of amortization was predicated on the prudence of CEI's original decision to build the nuclear facilities and the subsequent decision to cancel the plants. We must decide whether the test of prudence, as applied by the commission, which supports treating the expenditures associated with the terminated nuclear generating stations as amortizable costs, is consistent with the statutorily mandated ratemaking formula contained in R. C. 4909.15.

### IV B(i).

The controversy surrounding the cancelled nuclear power plants focuses primarily on R. C. 4909.15(A)(4), which delineates the service-related costs that a utility may recover from its ratepayers. This section states in relevant part:

"The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges shall determine:

"* * *

"(4) The cost to the utility of rendering the public utility service for the test period* * *."

The commission urges that "an expenditure by a utility can be considered a cost of rendering the public utility service if it fails in fact to achieve its intended purpose* * *[if] the expense was reasonably calculated to provide [future] utility service at a reasonable cost." The underpinnings for the commission rationale may be found in those statutory provisions that require utilities to maintain adequate service presently and for the foreseeable future. See, *e.g.,* R. C. 4905.22 (adequate service and facilities).

Notwithstanding the provisions that impose a duty on utility companies to plan for the future, the question under R. C. 4909.15(A)(4) remains whether the cancelled plant expenditures represent "[t]he cost to the utility of rendering the

public utility service for the test period." Test period considerations aside, what the company sought and what the commission granted was the amortization as service-related costs of an investment that never provided any service whatsoever to the utility's customers.

We seriously question whether the General Assembly contemplated that the commission would treat the type of expenditures controverted herein as costs under R. C. 4909.15 (A)(4). The now terminated nuclear plants represented a major capital investment that ultimately would have been included in the rate base under R. C. 4909.15(A)(1), had the projects not been cancelled. It is our opinion that R. C. 4909.15(A)(4) is designed to take into account the normal, recurring expenses incurred by utilities in the course of rendering service to the public for the test period.[8] A non-exhaustive list of such expenses would include reasonable expenditures for repairs, maintenance, personnel-related costs, administrative expenses, and taxes.

The extraordinary loss sustained by CEI in connection with the terminated nuclear plants cannot be transformed into an ordinary operating expense pursuant to R. C. 4909.15 (A)(4) by commission fiat. The commission's statement that "[c]ancellation does not create a past loss, but gives rise to a current cost" is unpersuasive. Under this rationale we question whether there could ever be a "past loss" the return of which would not be recoverable in future ratemaking proceedings notwithstanding the commission's assertion to the contrary. The commission's characterization of the investment in the four terminated plants as "cost" under R. C. 4909.15 (A)(4) in light of what we perceive to be the legislative intention underlying that section is unreasonable. Therefore, to the extent that the commission's order in regard to the cancelled plants is predicated on R. C. 4909.15(A)(4), the order cannot stand.

### IV B(ii).

The commission and CEI also argue that even if, as we

---

[8] Appellants contend that the "direct, primary benefit" test enunciated in *Cleveland* v. *Pub. Util. Comm.* (63 Ohio St. 2d 62), *supra,* is applicable to the case at bar. We disagree. The direct, primary benefit standard should not be wrenched from the institutional advertising expenses and charitable contributions context in which it arose.

have found, R. C. 4909.15(A)(4) is inapplicable, then under R. C. 4909.15(D)(2)(b) the commission may authorize the amortization of the investment in the terminated nuclear facilities.

R. C. 4909.15 states in relevant part:

"(D) When the public utilities commission is of the opinion, after hearing and after making the determinations under divisions (A) and (B) of this section***that the maximum rates, charges, tolls, or rentals chargeable by any such public utility are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall:

"***

"(2) With due regard to all such other matters as are proper, according to the facts in each case,

"***

"(b)***fix and determine the just and reasonable rate, fare, charge, toll, rental, or service to be rendered, charged, demanded, exacted, or collected for the performance or rendition of the service that will provide the public utility the allowable gross annual revenues under division (B) of this section, and order such just and reasonable rate, fare, charge, toll, rental, or service to be substituted for the existing one.***"

For purposes of R. C. 4909.15(D)(2)(b) the question presented is whether the cancelled nuclear power plant costs fall under the "all such matters as are proper" language of the statute. The commission views R. C. 4909.15(D)(2)(b) as a virtual wild card to be played whenever the commission in its discretion sees fit. We interpret the statute less sweepingly, first because the provisions are linked inextricably with the ratemaking factors contained in R. C. 4909.15(A) and (B), and secondly because the General Assembly undoubtedly did not intend to build into its recently revised (1976) ratemaking formula a means by which the commission may effortlessly abrogate that very formula.

To be a proper matter giving rise to a permissible adjustment under R. C. 4909.15(D)(2)(b), the matter in question must relate to factors otherwise included in R. C. 4909.15. R. C. 4909.15(D)(2)(b) makes reference to "the allowable *gross*

annual revenues under division (B)." (Emphasis added.) Having previously determined that the nuclear plant costs are not properly includable under R. C. 4909.15(A), then these costs can have no effect on the gross annual revenue determination under R. C. 4909.15(B). Therefore, we reject the commission's argument invoking R. C. 4909.15(D)(2)(b) as alternative statutory authority for its order granting CEI permission to amortize its investment in the cancelled nuclear facilities.

It is our view that R. C. 4909.15(D)(2)(b) is designed to allow the commission to make minor adjustments to rates ascertained by the statutory formula when the criteria upon which the rates are based are skewed for one reason or another. Thus, under R. C. 4909.15(D)(2)(b), the commission may smooth out anomalies in the ratemaking equation that tend to make the test year data unrepresentative for ratemaking purposes.

## IV B(iii).

"[T]his court has consistently recognized that the Public Utilities Commission is a creature of the General Assembly and may exercise no jurisdiction beyond that conferred by statute." *Dayton Communications Corp.* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 302, 307. See, also, *Werlin Corp.* v. *Pub. Util. Comm.* (1978), 53 Ohio St. 2d 76, 80; *Ohio Public Interest Group* v. *Pub. Util. Comm.* (1975), 43 Ohio St. 2d 175, 176, paragraph five of the syllabus; *Penn Central Transportation Co.* v. *Pub. Util. Comm.* (1973), 35 Ohio St. 2d 97, paragraph one of the syllabus. Stated differently, the commission may not legislate in its own right. This, however, is what the commission has attempted to accomplish in the case at bar.

The commission order engrafts upon the statutory ratemaking scheme an exception that would allow utility companies to recover their investment in unfinished projects ineligible for rate base treatment if the original decision to build the facilities and the subsequent decision to cancel the projects are prudent under the circumstances. In so doing the commission has exceeded its statutory mandate. We hold that the commission unreasonably and unlawfully exceeded its statutory authority when it approved amortization of CEI's investment in the four terminated nuclear power plants.

## IV C.

Appellants contend that the commission also erred in including the cancelled plant costs in the calendar year 1979 test period because the termination was not announced until January 23, 1980. Inasmuch as we have already determined that the commission improperly allowed amortization of the utility's investment in the terminated nuclear facilities, it is unnecessary for us to address the timing issue raised in this cause.

## IV D.

We are mindful of the policy considerations that prompted the commission's decision. The commission, CEI, and the *amici* argue strenuously that to rule as we have today will seriously disadvantage Ohio utilities in capital markets thereby "driv[ing] up the return on investment required by investors in Ohio utilities." This gloomy scenario, however, does not imbue the commission with the authority to rewrite the statutes. The statutes in question contain no provisions insulating investors from the type of losses sustained in the cancelled-plants venture.

If, as has been argued, these are parlous times for the utilities industry, and if, therefore, in order to attract and retain investment capital, utility companies must not only be granted a fair and reasonable rate of return pursuant to statute but must also be assured the return of capital invested in failed projects that would otherwise not be recoverable under the ratemaking formula, then the commission and the utilities should petition the General Assembly to enact changes in the ratemaking structure so as to provide this extra modicum of protection for the investors. Absent such explicit statutory authorization, however, the commission may not benefit the investors by guaranteeing the full return of their capital at the expense of the ratepayers. Under the ratemaking formula now in effect consumers are not chargeable for utility investments and expenditures that are neither included in the rate base nor properly categorized as costs. What we previously stated in a rate base case is applicable to the case at bar: "* * * It is only proper that their [the investors] venture be found operational before they commence to recoup their

capital outlays from the consumers." *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 449, 456-457.

We take a dimmer view of the second policy argument advanced by the commission to support its order. The commission suggests that if the appellants prevail on this issue, then "[r]ather than prudently cancel certain projects, it is not inconceivable that at least some utility managements would complete expenditures on a project and have ratepayers pay a return on dollars which would have more wisely not been spent." R. C. 4909.154 specifically empowers the commission to investigate management policies, practices and organization to determine whether a public utility is properly managed. If a utility completes a project that should have been abandoned, then the commission must under the "used and useful" requirement of R. C. 4909.15(A)(1) disallow rate base treatment and under R. C. 4909.154 disallow any claimed operating expenses related to the unnecessary project. We are confident that if any utility managers who might be tempted to act as the commission suggests are aware that the commission, pursuant to its statutory responsibilities, is vigorously scrutinizing all proposed and in-progress construction projects, these managers will decide whether or not to abandon a particular project according to their best and most prudent business judgment. Thus, we reject the commission's argument that our decision today may engender imprudent decision making in utility company boardrooms.

For reasons hereinbefore stated the order of the commission is affirmed in part and reversed in part, and this cause is remanded to the commission for a redetermination of CEI's allowable operating expenses, excluding therefrom the expenditures attributable to the cancelled nuclear facilities.

*Order reversed in part and*
*affirmed in part.*

CELEBREZZE, C. J., W. BROWN and C. BROWN, JJ., concur.

P. BROWN, LOCHER and HOLMES, JJ., concur in part and dissent in part.

PAUL W. BROWN, J., concurring in part and dissenting in part.

I concur in Parts I, II and III of the majority opinion insofar as they affirm the commission's decision to allow rate base treatment for CWIP attributable to the Bruce Mansfield coal-fired generating station. I dissent, however, from Part IV of the opinion.

In Part IV of its opinion, the majority reverses the commission's decision to allow amortization of the costs incident to termination of the four nuclear facilities in question. In so doing, the majority does not disturb the commission's findings that CEI acted both prudently and reasonably in incurring these costs. Instead, the majority holds that it was not the intent of the General Assembly to treat expenditures of this type as "costs" within the meaning of R. C. 4909.15(A)(4). I believe the majority's interpretation of this section to be too restrictive.

The term "cost" is not defined in R. C. Chapter 4909. Therefore, it is necessary to look elsewhere to ascertain the meaning of this word. In 1961, the commission adopted standard accounting procedures to be used by Ohio utilities. "The system of accounts and records identified and designated as 'Uniform System of Accounts Prescribed for Public Utilities and Licensees effective January 1, 1961'***is adopted by this Commission***." Ohio Adm. Code 4901:1-9-05. This "Uniform System of Accounts" was promulgated in 18 C.F.R., Part 101.

An analysis of this uniform system clearly demonstrates that expenditures such as those incurred in the termination of the four nuclear generating units were intended to fall within the statutory definition of "costs." The uniform system states, in part:

"182 Extraordinary property losses.

"A.***this account shall include extraordinary losses on property *abandoned* or otherwise retired from service which are not provided for by the accumulated provisions for depreciation or amortization and which could not reasonably have been foreseen and provided for***." (Emphasis added.) *Id.,* at 324.

"407 Amortization of property losses.

"This account shall be charged with amounts credited to account 182***." *Id.,* at 356.

This accounting system has been in effect in Ohio for approximately two decades. Given this fact, we can reasonably assume that the General Assembly was cognizant of its existence when it amended R. C. 4909.15 in 1976, and that it was not the intent of the General Assembly to treat these extraordinary property losses in a different manner in which they were treated by the Public Utilities Commission.

Moreover, as the majority correctly notes, "the overwhelming weight of authority from other jurisdictions supports the position of the commission." The majority dismisses this significant point with the facile statement that none of the cases from these other jurisdictions represents the opinion of the highest court of the jurisdiction; nor, has any other jurisdiction construed or applied Ohio law in reaching its determination. While I do not assert that decisions from other jurisdictions are controlling in Ohio, I cannot accept the majority's summary disposition of these foreign decisions. First, this court, in the past, has recognized the persuasive value of decisions from other jurisdictions in this area. See *Ohio Water Service Co.* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 12. Second, the near unanimity of decisions from other jurisdictions allowing amortization of these types of expenditures further demonstrates the reasonableness of the commission's decision in this case.

Appellants urged before this court that before any expense or cost could be passed on to the ratepayers, it must confer a direct and primary benefit upon said ratepayers. Implicit in the majority's decision is an acceptance of this argument. Thus, the majority, today, takes another step toward entrenching the spurious "direct, primary benefit" test into the public utilities law of Ohio.[9]

"Review of orders of the Public Utilities Commission on appeal is limited to a consideration of whether the order is unreasonable or unlawful * * *." *Cremean* v. *Pub. Util. Comm.* (1976), 48 Ohio St. 2d 163, paragraph one of the syllabus. The order in the instant cause is neither unreasonable nor unlawful. Accordingly, I would affirm the decision of the commission in its entirety.

---

[9] See Justice Herbert's dissent in *Cleveland* v. *Pub. Util. Comm.* (1980), 63 Ohio St. 2d 62, 75, in which I concurred.

HOLMES, J., concurs in the foregoing concurring and dissenting opinion.

LOCHER, J., concurring in part and dissenting in part. I concur in the syllabus and Parts III (notice and staff investigation) and IV (amortization) of the majority opinion. I would also note, however, that the financial effect of this decision on CEI will be insignificant. CEI informed its investors in its "1979 Annual Report": "* * * The Company [CEI] will seek the approval of the Federal Energy Regulatory Commission and The Public Utilities Commission of Ohio for authority to amortize [the costs previously expended toward the four nuclear units whose construction CAPCO terminated] over a suitable number of years. The extent to which these costs may be recovered through rates will be determined by the PUCO. If any costs of termination are not permitted to be recovered, the Company would be required to reduce Net Income by the disallowed amount. In any event, the resolution of these matters should not have a material adverse impact on the financial position of the Company."

I dissent from Part I of the majority opinion (CWIP), because PUCO refuses to define standards for review of CWIP matters. My dissenting opinions in *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 117, and *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 66 Ohio St. 2d 162, 167, express the reasons for my concern.