OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Consumers' Counsel *v.* Pub. Util. Comm. (1983), 6 Ohio St. 3d 405.]

(No. 82-1428—Decided August 31, 1983.)

Mr. *William A. Spratley,* consumers' counsel, Mr. *Timothy C. Jochim* and Mr. *Bruce J. Weston,* for appellant.

Mr. *Anthony J. Celebrezze, Jr.,* attorney general, Mr. *Harris S. Leven* and Ms. *Marsha R. Schermer,* for appellee.

Messrs. *Fuller & Henry,* Mr. *Paul M. Smart* and Mr. *Fred J. Lange, Jr.,* for intervening appellee.

*Per Curiam.* This appeal presents two issues for our consideration. The first is whether the commission unlawfully or unreasonably provided Toledo Edison with an additional quartile increment in its cost of common equity based on the perceived increased risk to investors occasioned by *CEI.* The second issue is whether the commission's continued amortization of the depreciation reserve deficiency violated R.C. 4909.15.

The first question is controlled by our recent decision in *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 111 (hereinafter "*CEI II*"), which considered a virtually identical cost of equity increment granted to the Cleveland Electric Illuminating Company (hereinafter "CEI"). In *CEI II,* OCC made the same argument that it advances herein, namely that the enhanced cost of equity actually represents a return on the cancelled plants, which return this court specifically disallowed in *CEI.* We addressed this argument in *CEI II* at page 115 as follows:

"Consumers' Counsel contends that consideration of the increased risk found to arise from our decision in *CEI* when calculating return on common equity violates the holding that ratepayers not pay for the terminated units.

The determination of the rate, however, was based on empirical data presented by the company's rate of return witnesses, which testimony was considered relevant to that determination.

"R.C. 4909.15 (A)(2) requires the commission to determine a fair and reasonable rate of return to the utility. The question whether a decision of this court may have so increased the perceived risk to investors as to require a higher rate of return on common equity is one the commission may consider as a factor in its decision. We do not find the commission's action in this regard 'so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty' and accordingly, find no error."

In the instant case the cost of equity determination "was based on empirical data," *e.g.*, the First Boston Electric Utility Index and the Standard and Poor's 22 Electric Utility Index, as interpreted by the expert witnesses. This evidence is sufficient to support the commission's decision to allow an incremental risk adjustment just as it was in *CEI II*. Therefore, we reject OCC's contention that the commission allowed Toledo Edison an unreasonable or unlawful cost of common equity.

We now turn to the second issue, which involves the propriety of the commission's continued amortization of the depreciation reserve variance. "A 'depreciation reserve' is an accounting technique whereby a fund is built up from annual contributions, as an item of expense of operation, over a period of time representing the service life of a public utility plant to offset and to equal in value the ultimate total loss through use of the utility property so that at the end of such service life the depreciation reserve fund will replace the property so worn out by the various factors of depreciation." *Columbus* v. *Pub. Util. Comm.* (1950), 154 Ohio St. 107 [42 O.O 186], paragraph three of the syllabus.[1] A depreciation reserve variance, either an underaccrual or overaccrual, results when the booked depreciation reserve differs from the theoretical reserve.

In the instant case we are confronted with an underaccrual that the commission first recognized in *Re Toledo Edison, supra*. A depreciation study completed in 1975 indicated that Toledo Edison had a depreciation reserve deficiency. Toledo Edison submitted the results of the depreciation study in its 1976 rate case. The commission approved the amortization of the approximately $20 million underaccrual after finding that Toledo Edison had "presented testimony indicating that the reserve deficiency has been created as a result of reduced useful lives and the existence of projected negative salvage values for certain items of its property. The record does not suggest any deliberate understatement of depreciation expense. The company has had depreciation studies and updates performed four times within the past fifteen years and has employed rates consistent with the results of such studies throughout the period." 17 P.U.R. 4th, at page 442. The commission

---

[1] *Columbus* v. *Pub. Util. Comm., supra,* was overruled on other grounds in *Cleveland* v. *Pub. Util. Comm.* (1956), 164 Ohio St. 442 [58 O.O. 289].

determined that "amortizing the variance over a specific period of time, not to exceed the remaining life of the property * * * [was] preferable to revision of otherwise proper accrual rates." *Id.* The amortization of the depreciation reserve deficiency was not challenged in the 1976 case or in the two other Toledo Edison rate cases immediately preceding the instant case.

OCC bases its challenge to the continued amortization of the depreciation reserve variance on *CEI*. OCC contends that "the present or future recovery in rates of any past depreciation reserve shortfall or deficiency by a public utility is unlawful under section 4909.15, Ohio Revised Code." To support this contention OCC characterizes the depreciation reserve variance as a "past loss" analogous to the loss sustained by CEI in the cancelled plants venture. This characterization is the basis of OCC's assertion that "[t]he depreciation reserve deficiency herein is a *past loss* incurred *prior* to the test period that is *not* a cost of the test period *or* future utility service" (emphasis *sic*), and hence an improper item of expense under the ratemaking statutes.

OCC's reliance on the "past loss" discussion in *CEI* is misplaced. A principal factor in our decision in *CEI* was the nature of the expenditures at issue. We stated at page 164 that "[w]e seriously question whether the General Assembly contemplated that the commission would treat the type of expenditures controverted herein as costs under R.C. 4909.15(A)(4). The now terminated nuclear plants represented a major capital investment that ultimately would have been included in the rate base under R.C. 4909.15(A)(1), had the projects not been cancelled. It is our opinion that R.C. 4909.15(A)(4) is designed to take into account the normal, recurring expenses incurred by utilities in the course of rendering service to the public for the test period. * * *

"The extraordinary loss sustained by CEI in connection with the terminated nuclear plants cannot be transformed into an ordinary operating expense pursuant to R.C. 4909.15(A)(4) * * *."

Thus, in *CEI* this court reversed the commission for its transformation without statutory authorization of a "major capital investment," which had never provided any service to the utility's customers, into an item of expense. We are confronted with no such transformation in the case at bar because depreciation, unlike unbuilt generating facilities, is a "cost to the utility of rendering the public utility service." For this reason the case at bar and *CEI* are distinguishable. This conclusion does not, however, end our inquiry. We must now consider whether the amortization of the depreciation reserve deficiency "represent[s] the type of anomalous condition for which inclusion of costs not incurred during the test period would be permissible." *Dayton Power & Light Co.* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 91, 94.

OCC, as previously noted, strenuously argues that the amortization in question amounts to rate recognition of a "past loss." A more accurate characterization of this amortization is to define it as a pre-test year adjustment, subject to the same type of analysis we have used in cases involving post-test year adjustments. In *Consumers' Counsel* v. *Pub. Util. Comm.*

(1981), 67 Ohio St. 2d 372 [21 O.O.3d 234] (hereinafter *"EOG"*); *Ohio Water Service Co.* v. *Pub. Util. Comm.* (1983), 3 Ohio St. 3d 1; and *DP&L, supra,* this court held that post-test-year adjustments for wage increases negotiated between the respective utilities and their employees "would violate the test-year concept embodied in R.C. 4909.15." *EOG,* at page 374. The post-test-year wage adjustment cases have not, however, established as an "absolute rule," *Ohio Water Service,* at page 3, that "only expenses incurred during the test period may be included in awarding a rate increase." *Id.* To the contrary, "we [have] acknowledged * * * that the test-year data are not immutable and have upheld appropriate exceptions in previous cases * * *." *DP&L,* at page 95. For example, in *Bd. of Commrs.* v. *Pub. Util. Comm.* (1982), 1 Ohio St. 3d 125, this court affirmed an order of the commission allowing the Dayton Power & Light Company (hereinafter "DP&L") to recover additional expenses incurred in a post-test-year line clearance program ordered by the commission. Moreover, some expenses are recoverable pursuant to statute irrespective of test-year considerations. See, *e.g., DP&L,* paragraph one of the syllabus (construing R.C. 4909.161), and at pages 96-97.

A depreciation reserve is an expense item specifically contemplated by statute. R.C. 4905.18 provides in pertinent part:

"Every public utility shall carry a proper and adequate depreciation or deferred maintenance account, whenever the public utilities commission, after investigation, determines that a depreciation account can be reasonably required. The commission shall ascertain, determine, and prescribe what are proper and adequate charges for depreciation of the several classes of property for each public utility. * * * The charge for depreciation shall be such as will provide the amount required over the cost and expense of maintenance to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry. The commission may prescribe such changes in such charges for depreciation as it finds necessary."

The commission effectively determined in 1976 that Toledo Edison's depreciation reserve would not provide "the amount required * * * to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry" and, pursuant to statute, prescribed changes, including the amortization controverted herein. The link between the statutory authority and the requested adjustment is stronger in the instant case than in *Bd. of Commrs.* While R.C. 4905.06, cited in *Bd. of Commrs.,* contains general language authorizing the commission to act "for protection of the public safety," R.C. 4905.18 speaks directly to depreciation charges and changes therein and R.C. 4909.15 (D)(1), a part of the rate-making section, states that the commission is to give "due regard * * * to the necessity of making reservation out of the income for * * * depreciation * * *" in fashioning rates. If the line clearance adjustment in *Bd. of Commrs.* was proper then the depreciation adjustment at issue herein, which has a firmer statutory basis, is proper as well.

In our view, R.C. 4905.18 and 4909.15 must be read *in pari materia* if the legislative intention underlying the former statute is to be given effect. Accordingly, we hold that the amortization of the depreciation reserve deficiency is a permissible adjustment to Toledo Edison's expenses and affirm the decision of the commission.

*Order affirmed.*

CELEBREZZE, C.J., COOK, SWEENEY, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.

LOCHER, J., dissents.

COOK, J., of the Eleventh Appellate District, sitting for W. BROWN, J.

LOCHER, J., dissenting.

## I

I dissent from the decision and opinion of the majority allowing Toledo Edison an additional increment in its cost of common equity based on the perceived increased risk to investors which is attributable to our decision in *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153 [21 O.O.3d 96], dismissed in 455 U.S. 914 ("*CEI*").

In *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 111, 116 ("*CEI II*"), I expressed my dismay because that decision marked "* * * the second time that the majority of this court ha[d] turned its back on *CEI*. See *Consumers' Counsel* v. *Pub. Util. Comm.* (1982), 1 Ohio St. 3d 22 ('*Consumers' Counsel* [1982]')." 4 Ohio St. 3d, at 117. Today's decision is, therefore, the *third* time that the majority of this court has departed from *CEI* by allowing Toledo Edison to recover *via* an increased cost of common equity what *CEI* prohibited by means of amortization. I can only conclude that what I viewed as an "abject retreat" in *CEI II* has become a stampede. *CEI* is a noteworthy precedent which we should follow. The majority of this court, however, has reduced *CEI* to an inconvenient citation which is distinguished summarily.

Accordingly, for the reasons stated in my dissent in *CEI II*, 4 Ohio St.3d, at 116-117, I dissent from the holding of the majority allowing Toledo Edison to increase its cost of common equity based on the perceived increased risk to investors which is attributed to *CEI*.

## II

That portion of the majority opinion which affirms the commission's manipulation of the cost of common equity disregards the holding of *CEI*. In addition, the majority's treatment of the requested amortization of a "depreciation variance" ignores the *rationale* of *CEI*. That is, the cornerstone of the *CEI* analysis is this court's traditional recognition of the test-

year concept. "It is our opinion that R.C. 4909.15 (A)(4) is designed to take into account the normal, recurring expenses incurred by utilities in the course of rendering service to the public for the test period." *CEI,* 67 Ohio St. 2d, at 164 (footnote omitted). See, also, *Dayton Power & Light Co.* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 91, 106-107 (Locher, J., dissenting).

"The extraordinary loss sustained by CEI in connection with the terminated nuclear plants cannot be transformed into an ordinary operating expense pursuant to R.C. 4909.15 (A)(4) by commission fiat. The commission's statement that '[c]ancellation does not create a past loss, but gives rise to a current cost' is unpersuasive. Under this rationale we question whether there could ever be a 'past loss' the return of which would not be recoverable in future ratemaking proceedings notwithstanding the commission's assertion to the contrary." *CEI,* 67 Ohio St. 2d, at 164.

I disagree, therefore, with the majority's summary dismissal of *CEI* as authority controlling the issue of amortization of depreciation variance. A closer examination of the issues and testimony reveals the flaws in the majority approach.

For example, the majority merely mentions that the depreciation variance at issue is the difference between the "booked" and "theoretical" depreciation reserves. The definition of these terms, however, is important to an understanding of the real issues in this case.

"Booked" depreciation is the original allowance for depreciation. "Theoretical" depreciation is the proposed allowance. By definition, therefore, there will be a difference between the two.

As acknowledged by one of Toledo Edison's own witnesses in this case, amortizing that difference transforms the customary whole life depreciation method — which is the original service life estimate — into the remaining life method. The commission itself has already disapproved of the remaining life approach.

"From a legal standpoint, remaining life is on something less than solid ground. This Commission has previously been presented with proposed depreciation accrual rates utilizing remaining life rates and has rejected such rates primarily because we found it would be unfair to make present and future ratepayers 'pay for the past inadequacy' of past depreciation rates. See, *e.g., Dayton Power & Light Co.,* Case No. 79-372-GA-AIR, Opinion and Order, May 7, 1980, at p. 14. We also believe that the implications of *C&SOE* v. *Pub. Util. Comm.*(1980), 64 Ohio St. 2d 175 [18 O.O.3d 389] [dismissed in 452 U.S. 933] and *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153 [21 O.O.3d 96] address this issue. Although these decisions are not on all fours factually with the instant case, the Ohio Supreme Court's pronouncements with respect to the impropriety of recovering past losses through present and future rates can certainly not be ignored. Of particular interest is the fact that the Court did not view the reasonableness or prudence of the initial decision, be it the Commission's, as in *Columbus and Southern, supra,* or management's, as in *Consumers' Counsel, supra,* to be

material to the question of whether the loss occasioned thereby could be recognized through future rates. Here, the present accrual rates were fixed by the Commission based on the best evidence available at the time. *The fact that the estimate of service lives has now changed does not justify charging the present ratepayers for this past misallocation." In re General Telephone Co.* (April 26, 1982), case No. 81-383-TP-AIR, *et al.,* at page 26. (Emphasis added.)

The commission's own words, therefore, condemn the result which the majority affirms. Furthermore, a minority of this court has already recognized the inequity of permitting utilities to manipulate depreciation figures to increase rates. See *Duff* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 367, 382 [10 O.O.3d 493] (Locher, J., dissenting).

Therefore, the commission erred by failing to rule coincident with the testimony of its own staff witness:

"Q Would you agree that the amount of depreciation reserve deficiency does not represent costs to the Company of providing electric service during the test year, or during the time period when the rates set in this case will be in effect?

"* * *

"A * * * It clearly represents a catch-up of a past underaccrual which was found in 1975, and if anything, it just reflects *the past misallocation of depreciation expense* prior to 1975. So it therefore *does not affect the actual cost during the test year* at all, no." (Emphasis added.)

Accordingly, I dissent from the majority opinion *in toto* because the majority continues to erode the holding, and ignore the reasoning, of *CEI.*