CLEVELAND ELECTRIC ILLUMINATING COMPANY, APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as Cleveland Elec. Illum. Co. *v.* Pub. Util. Comm. (1984),
12 Ohio St. 3d 320.]

(No. 83-677—Decided August 8, 1984.)

*Mr. Alan D. Wright, Mr. Craig I. Smith, Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann* and *Mr. Richard W. McLaren, Jr.,* for appellant.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, *Mr. Robert S. Tongren* and *Mr. Donn D. Rosenblum,* for appellee.

*Per Curiam.* The scope of review applicable to this court when reviewing an order of the commission is set forth in R.C. 4903.13, which provides in pertinent part:

"A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

As stated in *Columbus* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 103, 104 [12 O.O.3d 112]:

"Under the 'unlawful or unreasonable' standard specified in R.C. 4903.13, this court will not reverse or modify an opinion and order of the Public Utilities Commission where the record contains sufficient probative evidence to show that the commission's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty." See, also, *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 372, 373 [21 O.O.3d 234]; *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153, 156 [21 O.O.3d 96]; *Ohio Utilities Co.* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 153, 164 [12 O.O.3d 167]. With this standard of review in mind, we now address the substantive considerations presented by CEI's appeal.

## I

The first challenge presented by CEI relates to the commission's treatment of AFUDC. As recognized by this court in *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 6 Ohio St. 3d 377, 378: "AFUDC is an accounting mechanism which recognizes capital costs associated with financing construction. Generally, the capital costs recognized by AFUDC include interest

charges on borrowed funds and the cost of equity funds used by a utility for purposes of construction."

In appellant's preceding rate case, No. 81-146-EL-AIR, the commission determined that AFUDC had been improperly accrued since 1977. The commission therefore ordered CEI to restate its capital accounts to reflect proper AFUDC computations, *i.e.*, AFUDC net-of-tax while reducing CEI's rate base by $5,229,000. The commission further recognized that future reductions from rate base might be necessary as a result of improper AFUDC accruals.

In the present cause, the commission was again presented with an overaccrual of AFUDC; however, in this instance the overaccruals were improperly booked on projects not yet included in CEI's rate base. The commission, in addressing this issue, first noted that "* * * where a company has booked excessive AFUDC, the interest deduction available to the company will be greater than that to which it would have been entitled had AFUDC been properly booked net-of-tax." Continuing, the commission reasoned that "[s]imply reducing rate base by eliminating the excess AFUDC component [when the plant goes into service] will not remedy this problem, as * * * [CEI] still retains the entire benefit of the excess interest deduction associated with property not yet in rate base."

Relying upon its prior determination in case No. 81-146-EL-AIR, as well as the evidence of record and the recommendation of its staff, the commission concluded that a deduction should be made from rate base so as to flow through to present customers the amount of the tax benefits received while improperly booking AFUDC. CEI challenges the commission's opinion and order on this issue, contending that the order violates R.C. 4903.09 for failing to adequately explain why the rate base deduction was made.

R.C. 4903.09 provides that "[i]n all contested cases * * * the commission shall file * * * findings of fact and written opinions setting forth the reasons prompting the decisions arrived at * * *."

Recently, this court had occasion to again address the requirements of R.C. 4903.09, stating that "[t]he purpose of * * * [this section] is to provide this court with sufficient details to enable us to determine, upon appeal, how the commission reached its decision. See *General Tel. Co.* v. *Pub. Util. Comm.* (1972), 30 Ohio St. 2d 271 [59 O.O.2d 338]." *Cleveland Elec. Illum. Co.* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 107, 110. Without question, the subject order complies with this directive.

First, the commission discussed similar rate base adjustments as a result of CEI's overaccrual of AFUDC in case No. 81-146-EL-AIR, decided in March 1982. That opinion and order sets forth in detail the commission's position regarding CEI's retention of excess tax benefits as a result of having overaccrued AFUDC. In the subject cause, the commission not only referenced its earlier decision, but it again discussed, at length, the ramifications of appellant's overaccruals, citing various exhibits and portions of the transcript.

One such reference was to the testimony of staff witness Roger Montgomery who stated:

"Applicant's objection raises two issues. The first issue concerns the Staff's AFUDC adjustment reducing rate base. Applicant's dissention is noted. However, nothing stated in * * * [the] testimony [of CEI's witness] persuades the Staff to deviate from the Staff's position and Commission decision rendered in Applicant's prior case, Case No. 81-146-EL-AIR."

Clearly, the opinion and order is not only supported by the record, but it also remains consistent with the commission's policy regarding the pass-through of tax benefits to either present or future customers, depending upon the circumstances presented. Cf. *Ohio Bell Tel. Co.* v. *Pub. Util. Comm.* (1981), 68 Ohio St. 2d 193 [22 O.O.3d 432]. Moreover, the commission's detailed findings of fact and conclusions of law contained in its order are readily distinguishable from the summary opinions and orders rejected by this court in *Ideal Transportation Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 195 [71 O.O.2d 183], paragraph one of the syllabus, and *Motor Service Co.* v. *Pub. Util. Comm.* (1974), 39 Ohio St. 2d 5 [68 O.O.2d 3], paragraph two of the syllabus. Accordingly, we reject CEI's assertion that the commission's opinion and order does not comply with the directives contained in R.C. 4903.09.

## II

Appellant's next contention focuses upon the commission's deduction of funds from its materials and supplies account on the basis that materials and supplies purchased with this account were applied toward new construction. Although CEI concedes that some test year materials and supplies held to maintain existing facilities in a good state of repair were utilized for purposes of new construction, CEI nevertheless contends that this court should recognize that the materials were *held* for purposes of repair and maintenance.

In *Cincinnati* v. *Pub. Util Comm.* (1954), 161 Ohio St. 395 [53 O.O. 304], this court addressed a similar contention, stating at 406-407:

"It is proper to include in the rate-base structure a reasonable sum to cover the company's investment in materials and supplies for the normal operations of the company and for maintenance and repair purposes. *But we know of no valid reason why an allowance should be made in the rate-base structure for investments in materials and supplies for new construction, extensions and additions, as distinguished from normal operations and plant maintenance and repair.* The cost of materials and supplies *held for new construction,* extensions and additions may be capitalized in rate-base structure, when such materials and supplies are in actual use. Prior to such actual use such property can not be considered as being 'used and useful for the service and convenience of the public,' as required by Section 499-9, General Code [now R.C. 4909.05]." (Emphasis added.)

CEI focuses on the phrase "held for new construction," contending that its materials and supplies were undisputably *held* for existing maintenance

and, as such, no deduction was warranted. CEI further contends that it should not be penalized for "borrowing" from its materials and supplies account to further new construction when its purpose is to reduce customer inconvenience or delay.

The commission, after citing *Cincinnati, supra,* rejected CEI's contention since it makes no difference whether an item is "borrowed" from inventory or whether it is "held" for maintenance purposes yet used for new construction. From a ratemaking standpoint, the commission is endowed with the responsibility of ascertaining whether materials and supplies, which are to be included for ratemaking purposes, are "used and useful in the rendition of service to the public * * *." R.C. 4909.05(E).

The commission determined that when CEI borrowed from its ratepayer supplied materials and supplies account for new construction, ratepayers, in effect, had been charged for property not currently used and useful. This conclusion is neither manifestly against the weight of the evidence nor unreasonable or unlawful.

Moreover, in concluding its discussion of this issue in *Cincinnati, supra,* this court reasoned:

"In view of this state of the record, we must conclude that the company did not submit sufficient basic evidence * * * to prove its claim that *all* its inventory of materials and supplies is necessary and will be used for the normal operations of the company and for ordinary maintenance and repair." (Emphasis added.) *Id.* at 407.

Clearly, an exception was not created whereby the commission is obligated to inquire as to the purpose contemplated by a utility when purchasing materials and supplies for the maintenance of existing facilities. As such, we conclude that the commission's reduction of appellant's materials and supplies account was both reasonable and lawful.

### III

Appellant further contends (1) that the commission erroneously deducted from its rate base a depreciation reserve attributable to the Mansfield generating facility which had been booked but not recovered from ratepayers, and (2) that a hypothetical increment to depreciation reserve, neither recorded on CEI's books nor recovered from ratepayers, was improperly deducted from rate base.

The record demonstrates that when the Mansfield generating facility went into service on September 29, 1980, CEI began to book depreciation on the unit in accordance with the Uniform System of Accounts adopted by the commission. In CEI's next rate proceeding, case No. 80-376-EL-AIR, the date certain was June 30, 1980, and the Mansfield facility was included in the rate base as construction work in progress. In addition, depreciation accruals were included as an allowable expense. The new rates, however, did not become effective until May 6, 1981.

In the present case, the commission deducted the booked depreciation

reserve for the Mansfield generating facility, including a portion which was booked prior to May 6, 1981, the date that the depreciation expense for the facility was reflected in CEI's rates. CEI contends that the accrual of depreciation reserve during this interval was investor supplied capital upon which it was entitled to earn a return. Cf. *Ohio Edison Co.* v. *Pub. Util. Comm.* (1962), 173 Ohio St. 478 [20 O.O.2d 108].

The commission argues that it has calculated an appropriate depreciation reserve based upon the entire Mansfield accounting scheme, whereas CEI has selected one item from its property account for which it seeks separate treatment.

In resolving this issue, we turn to the testimony of staff witness William F. Fox:

"* * * [The] Staff's purpose in this matter is to establish a depreciation reserve for ratemaking purposes. which is reasonable and which produces a match between the expenses and the plant that produces these expenses. * * * More specifically, as reflected * * * in the Applicant's next to last rate case, Case No. 80-376-EL-AIR, the Staff normalized the depreciation expense for Bruce Mansfield No. 3 for the entire test year although the unit was in service for only three months of the test year. Therefore, the rates granted in that earlier case, even though not made effective until early May 1981, recognized a full year of depreciation expense for the test year starting January 1, 1980."

A review of the record demonstrates that the commission, in essence, normalized CEI's depreciation for the Mansfield generating facility in its 1980 rate case and, as such, refused to segregate a specific depreciation factor claimed by CEI not to have been recovered in rates. Moreover, the commission is granted wide latitude under R.C. 4905.18 to determine "proper and adequate charges for depreciation." We therefore refuse to disturb the commission's findings on the propriety of CEI's request for separate treatment of the depreciation reserve attributable to the Mansfield generating facility.

Appellant's second depreciation contention centers upon the commission's computation of depreciation reserve. In case No. 81-839-EL-AAM, CEI's depreciation rates were updated by the commission. As a result, CEI was authorized to book higher depreciation rates.

In the instant cause, the commission recasted CEI's test year operations as if the new depreciation accrual rates had been changed at the beginning of the test year, thus reflecting the actual circumstances which occurred during part of the test year, as well as reflecting the posture of the Mansfield facility when the rates became effective.

Appellant does not challenge the commission's decision with respect to increased depreciation expenses which reflect higher rates. Appellant does contend, however, that the commission erred by adjusting its depreciation reserve rates to reflect the higher depreciation accruals.

The valuation of property for rate case purposes is specified under R.C.

4909.05 as the original cost of the property "at the date certain." The fixation of depreciation reserves, authorized under R.C. 4909.05(H), is subject to the commission's discretion. Appellant has failed in its burden to demonstrate that the commission abused its discretion in establishing just and reasonable depreciation reserves. Essentially, CEI seeks to have this court order the use of outdated depreciation rates which, if implemented, would allow CEI to either overstate its expenses or understate rate base. In view of the fact that the record supports the commission's depreciation adjustment, we decline to order that these rates be readjusted.

## IV

In its next proposition of law, CEI maintains the commission unreasonably and unlawfully failed to recognize an increase in wages as a test year expense.

In recent years, the issue of the inclusion in utility rates of employee wage adjustments has been addressed by this court on three separate occasions. *Consumers' Counsel* v. *Pub. Util. Comm., supra* (67 Ohio St. 2d 372 [21 O.O.3d 234]); *Ohio Water Service Co.* v. *Pub. Util. Comm.* (1983), 3 Ohio St. 3d 1; *Dayton Power & Light Co.* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 91. The rule which has clearly emerged is that wage increases incurred outside the test year do not constitute that type of unanticipated expense which justifies an *"ad hoc* tinkering" with the statutory test year concept. *Dayton Power & Light Co., supra.*

Appellant does not challenge the principle enunciated in the aforementioned cases. Rather, appellant contends the commission improperly denied a wage adjustment paid within the test period.

The record reveals that CEI's initial rate filing indicated that employee wage increases at its Bruce Mansfield facility were to take effect September 1, 1982, one day subsequent to the close of the test year. However, in his testimony before the commission, company witness Charles C. Chopp testified that the increases had been paid, pursuant to a previously executed contract, on August 16, 1982, within the test period. When asked to explain why the company began paying an obligation two weeks ahead of schedule, Chopp indicated that the September 1, 1982 date was an estimate, as the facility is co-owned with the Pennsylvania Power Company which manages the facility and effectuates payments.

In view of the significance of the dates involved, the commission asked for further clarification from CEI on this matter. In its opinion and order, the commission concluded that although further clarification on the wage increase obligation was sought, "[n]one has been provided. Given this state of the record, the Commission does not believe the [wage] adjustment should be approved." Appellant challenges this conclusion as being against the manifest weight of the evidence, for the reason that additional evidence was provided. A careful review of the record reveals that appellant's contention is well-taken.

The record demonstrates the following exchange took place between counsel for CEI and Louis G. Brown of the commission's staff at the November 1, 1982 hearing:

"Q. Now, * * * you say if the increase you are discussing became effective on August 16, and then you go on. I'm somewhat curious about the beginning of that sentence with 'if.' Do you have any doubt it will be effective on that day?

"A. The Applicant supplied the Staff with some information. After the Staff Report was completed and in the Applicant's Exhibit 1-D, they indicate that the Mansfield increase which was originally scheduled to take effect September the 1st became effective August the 16th. At the time the Staff received that information, we did not have the time to go into the details to get back-up to that information. I did put in a data request asking for what date the increase actually became effective, and the company did supply the information.

"Q. What information did you get, on the 16th?

"A. Yes.

"Q. So far as all this information that you have available to you at this present time, it indicates that August 16th was the right date?

"A. Yes."

In spite of this exchange, the commission remained skeptical as to whether CEI simply paid the wage increases in advance of the date called for in the labor contract, thus "packing" the test year in what could arguably constitute managerial imprudence under R.C. 4909.154. However, after the commission sought additional evidence on this issue, CEI complied by having the Pennsylvania Power Company forward more specific information regarding the effective date of the scheduled wage increases. Staff witness Brown's own testimony demonstrates that the wage increases were scheduled to take effect within the test year.

We therefore hold that the commission's conclusion, that the state of the record did not support the inclusion of the wage increases as a test year expense item, is against the manifest weight of the evidence and is hereby reversed. Moreover, if the commission desired more positive proof of the scheduled date of the increases, i.e., a copy of the agreement providing for the wage increases, then it should have so requested. The record, however, is devoid of such a request.

## V

Finally, CEI again challenges the commission's disallowance for ratemaking purposes of expenditures associated with the cancellation of nuclear generating facilities. On numerous occasions, this court has held that such costs are not allowable under Ohio's ratemaking statutes, *Consumers' Counsel v. Pub. Util. Comm., supra* (67 Ohio St. 2d 153 [21 O.O.3d 96]), and that such an interpretation does not constitute a confiscation of private property in violation of the Fifth and Fourteenth Amendments to the United

States Constitution. *Dayton Power & Light Co.* v. *Pub. Util. Comm., supra,* paragraph two of the syllabus; *Cleveland Elec. Illum. Co.* v. *Pub. Util. Comm., supra,* at 109. In view of the well-established principles set forth in the aforementioned cases, CEI's request for a ratemaking allowance for expenditures associated with the cancellation of nuclear generating facilities is again denied.

For the foregoing reasons, the order of the commission is affirmed in part and reversed in part, and the cause is remanded to the commission for a redetermination of CEI's allowable operating expenses, in view of the expenditures associated with increased labor costs demonstrated to have taken effect within the test year.

*Order reversed in part and*
*affirmed in part.*

CELEBREZZE, C.J., W. BROWN, SWEENEY, LOCHER, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.