# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00735-CV

**Appellant, Entergy Texas, Inc.//Cross-Appellants, Office of Public Utility Counsel and Public Utility Commission of Texas**

**v.**

**Appellees, Public Utility Commission of Texas and Texas Industrial Consumers// Cross-Appellees , Office of Public Utility Counsel and Entergy Texas, Inc.**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-13-000121, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

This is an appeal from a final order of the Public Utility Commission in a ratemaking proceeding filed by Entergy Texas, Inc. (Docket Number 39896) for authority to raise its electric rates and reconcile its fuel costs. Both Entergy and the Office of Public Utility Counsel filed suits for judicial review of various aspects of the Commission's order, and the suits were consolidated. The district court affirmed the Commission's order on all issues but one, pertaining to the Commission's use of a contemporaneous line-loss study in Entergy's fuel reconciliation, which the Commission appeals. Entergy complains that (1) the Commission improperly disallowed recovery of certain hurricane-restoration costs and (2) substantial evidence does not support the Commission's determination that Entergy's projected future purchased-capacity costs and transmission-equalization costs were not "known and reasonable changes" to its historical test-year

costs. The Office of Public Utility Counsel (OPUC) complains that substantial evidence does not support the Commission's inclusion of Entergy's 1997 ice-storm-repair expenses when computing its insurance reserve. We will affirm the district court's final judgment.

## BACKGROUND

In 2011, Entergy, an electric utility that remains subject to traditional cost-of-service rate regulation, *see* Tex. Util. Code § 39.452(a) (until date that Commission authorizes non-ERCOT utility to implement customer choice, utility's rates shall be regulated under traditional cost-of-service regulation), initiated a general base-rate case seeking an annual increase of over $100 million to cover its increased cost of service (Docket Number 39896). *See id.* § 36.051 (utility is entitled to rates that afford it "a reasonable opportunity to earn a reasonable return on [its] invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses").

The Commission sets rates based on a utility's cost of rendering service to the public during a historical "test year," adjusted for known and measurable changes. *See* 16 Tex. Admin. Code § 25.231(a), (b) (Pub. Util. Comm'n, Cost of Service). During the regulatory "lag" between rate cases, the utility bears the risk that its actual operating expenses will exceed the expectations incorporated into the rate, while retail customers bear the converse risk. *City of El Paso v. Public Util. Comm'n*, 344 S.W.3d 609, 613 (Tex. App.—Austin 2011, no pet.). Exceptions to this general rule of risk exist for certain categories of costs, such as fuel costs and energy-efficiency costs. For these types of costs, the utility has a separate rider through which it collects its projected costs, and it later must reconcile those revenues with its actual, reasonable costs so that it recovers

2

no more or less than its actual, reasonable costs for the category of expense covered by the rider. *See, e.g.*, 16 Tex. Admin. Code §§ 25.181 (Pub. Util. Comm'n, Energy Efficiency Goals) (providing for recovery of energy-efficiency costs), .235–.237 (Pub. Util. Comm'n, various) (providing for recovery of fuel costs). In Docket 39896, Entergy also sought to reconcile its fuel costs for a two-year period ending June 2001.

Entergy, the Commission, and OPUC each appeal a portion of the district court's final order in this suit for judicial review of the Commission's Final Order on Rehearing in this docket.

## STANDARD OF REVIEW

Our review is governed by the "substantial evidence" rule. Tex. Util. Code § 15.001; Tex. Gov't Code § 2001.174; *see Anderson v. Railroad Comm'n*, 963 S.W.2d 217, 219 (Tex. App.—Austin 1998, pet. denied). When an appellant contends that an agency's order is not supported by substantial evidence, we determine whether substantial evidence supports the challenged finding or conclusion, that is, not whether the agency reached the "correct" conclusion, but whether some reasonable basis exists in the record for the agency's action. *Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984); *see also City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994) (in conducting substantial-evidence review, we determine whether evidence as whole is such that reasonable minds could have reached conclusion agency must have reached in order to take disputed action). A reviewing court is not bound by the reasons given in an agency order, provided there is a valid basis for the action taken by the agency. *Charter Med.-Dall.*, 665 S.W.2d at 452.

3

## DISCUSSION

**Entergy's issues**

### A.    *Hurricane-reconstruction costs*

In its first issue, Entergy contends that the Commission improperly disallowed over $11 million of costs that it incurred to restore its system after Hurricane Rita. *See* Tex. Util. Code §§ 39.458(a) (purpose of statutory sections pertaining to "hurricane reconstruction costs" is "to enable an electric utility subject to this subchapter to obtain timely recovery of hurricane reconstruction costs and to use securitization financing to recover these costs, because that type of debt will lower the carrying costs associated with the recovery of hurricane reconstruction costs relative to the costs that would be incurred using conventional financing methods"), .459(a) (defining "hurricane reconstruction costs" and "Hurricane Rita"). Resolution of the parties' dispute hinges on whether the Commission properly determined that Entergy had already recovered the disallowed amount through rate-setting conducted in a prior docket.

After Hurricane Rita and pursuant to applicable statutes, Entergy filed an application with the Commission to recover its eligible hurricane-reconstruction costs through "securitization."[1] In that docket, Number 32907, the Commission and Entergy reached a settlement in which the parties agreed that over $380 million of Entergy's requested reconstruction expenses were eligible for securitization and that Entergy would deduct from that amount the insurance proceeds it expected to receive in the future. Because the insurance proceeds were an estimate, the parties

_____

[1] Securitization is a specialized form of debt financing where repayment of bondholders achieves a high degree of assurance, resulting in very low bond interest rates.

further agreed that after Entergy had received all of its insurance payments, a true-up would occur to determine the difference between the estimate and the amount actually received. The agreement, however, did not specify a method for recovering any insurance under-recovery from ratepayers, but implicit in the true-up provision was the Commission's approval of Entergy's future recovery of any such insurance-proceeds shortfall.

In Entergy's next base-rate case, Docket Number 37744, Entergy specifically requested the previously anticipated true-up by seeking (1) approval of a regulatory asset[2] in the amount of nearly $26 million (including accrued "carrying costs," or interest), due to its insurance-proceeds estimate from the securitization docket being lower than its actual receipts (the Rita asset) and (2) amortization of Rita asset through its base rates over five years. That docket also resolved by settlement, in which the parties entered into a "black box settlement" resolving all of the issues between the parties and raised by Entergy. In a "black box settlement," the parties agree to a total amount that the utility may recover in its rates without specifying any of the individual numbers used to calculate the amount. *See Cities of Dickinson v. Public Util. Comm'n*, 284 S.W.3d 449, 450 (Tex. App.—Austin 2009, no pet.) (defining "black box settlement"). Notably, neither the parties' stipulation nor the Commission's order in Docket Number 37744 directly referred to the Rita asset, although there is no dispute that Entergy specifically requested recovery of the Rita asset, amortized

---

[2] A "regulatory asset" is a mechanism by which a utility carries a cost on its books as a balance-sheet asset based on the expectation that the Commission will allow the utility to recover the cost over a period of years in the future (through amortization) instead of at the time the expenditure is made. *See City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 238 (Tex. 2001).

5

through its rates over five years, and that the Commission had previously authorized a true-up after Entergy's receipt of insurance proceeds.

In the docket presently on appeal, Entergy again requested approval of a Rita regulatory asset to recover the balance of its overestimated insurance proceeds, amounting to approximately $26 million, plus carrying costs. Several parties objected to the request, arguing that all or some of the amount should be denied because Entergy had (1) already recovered the balance via the black-box settlement reached in Docket Number 37744 and (2) received additional, unaccounted-for insurance proceeds since the conclusion of that docket. We therefore turn to the evidence before the Commission concerning prior Docket Number 37744 and Entergy's receipt of insurance proceeds.

In their Proposal for Decision (PFD) in the docket on appeal here, the Administrative Law Judges (ALJs) noted that in prior Docket Number 37744: (1) no party objected to Entergy's requested regulatory asset or amortization;[3] (2) the stipulation and settlement agreement stated that the parties resolved "all issues" except for one not relevant to this appeal; and (3) neither the stipulation and settlement agreement nor the Commission's order specifically disapproved, excluded, or deferred consideration of the recovery of the Rita asset, although those documents did specifically exclude or disapprove other items not relevant to this appeal. The ALJs also opined that whether

---

[3] Entergy contends that the Administrative Law Judges' (ALJs') recitation in the PFD that in Docket 37744 no party objected to Entergy's proposed amortization is incorrect, as in that docket witness Jacob Pous had testified on behalf of several intervening cities that instead of amortizing the Rita asset and recovering it through rates, Entergy should have to book the amount as a credit in its storm reserve. While Pous did so testify, he did not object to the length of amortization proposed by Entergy (five years) or submit that any other amortization period should be utilized, should the Commission reject his storm-reserve recommendation.

the Rita-asset issue was resolved or left unresolved in Docket Number 37744 was a "close call." Identifying factors supporting both findings and discussing the issue at length, the ALJs ultimately concluded that the prior docket did approve the Rita asset and that Entergy should have been amortizing the asset since the effective date of the rates approved in that docket and that, accordingly, Entergy's requested recovery should be reduced.[4] The PFD proposed an $11 million reduction in Entergy's requested amount, calculated as follows: beginning with the Rita-asset balance that Entergy requested in Docket Number 37744, subtracting the portion of that amount that should have been amortized for the period between when rates from that docket took effect until the end of the test year for this present docket, and subtracting the additional insurance proceeds that Entergy had received since the conclusion of Docket Number 37744. The Commission adopted the ALJs' findings and recommendations on the issue as set forth in the PFD without amendment.

On appeal, the Commission argues that any "ambiguity" in the prior order from Docket Number 37744 must be resolved in accordance with its interpretation because courts generally defer to an agency's interpretation of its prior order. *See Office of Pub. Util. Counsel v. Texas-New Mexico Power Co.*, 344 S.W.3d 446, 452–53 & n.5 (Tex. App.—Austin 2011, pet. denied) (agency is entitled to interpret its own prior order as long as it does not use occasion to amend prior order, and if prior agency order is ambiguous, we defer to agency's reasonable interpretation);

---

[4] The ALJs concluded their discussion of whether the prior docket approved the Rita asset thus: "Moreover, when there is uncertainty whether an *undisputed issue* was deferred for future consideration or was included within the rates set in a black-box settlement, the burden should be on the utility to establish that the issue was deferred for future consideration." As already indicated, nothing in the black-box settlement or the Commission's order approving the settlement indicated that resolution of the Rita asset would be deferred for future consideration.

7

*AEP Tex. N. Co. v. Public Util. Comm'n*, 297 S.W.3d 435, 447 (Tex. App.—Austin 2009, pet. denied) ("Just as we give great weight to an agency's interpretation of its own rules and regulations, we give great weight to an agency's interpretation of its administrative orders."); *Cities of Abilene v Public Util. Comm'n.*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.) ("If the Settlement Order is ambiguous, we will affirm the Commission's interpretation of it in the Final Order if the interpretation is supported by substantial evidence."). We agree.

Because (1) the issue of recovery and amortization of the Rita asset was specifically before the Commission and undisputed in Docket 37744; (2) the black-box settlement in that docket resolved "all issues"; and (3) the Rita-asset issue was not specifically excluded or deferred for future consideration, the Commission's interpretation of its prior order as approving the Rita asset, including it in Entergy's rates, and authorizing Entergy's requested amortization schedule is reasonable.[5] We conclude that there is a reasonable basis in the record for the Commission's determination to disallow the approximate $11 million of Entergy's requested hurricane-reconstruction costs. Accordingly, we overrule Entergy's first issue.[6]

---

[5] The Commission's interpretation is also in line with the doctrine of res judicata, which was raised by various parties and has been applied to administrative proceedings. *See McMillan v. Texas Nat. Res. Conservation Comm'n*, 983 S.W.2d 359, 364–65 (Tex. App.—Austin 1998, pet. denied) (res judicata applies to final decisions made by administrative agencies in their adjudication of contested cases, including final orders embodying settlement agreement among parties); *see also Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007) (listing elements of res judicata); *Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n*, 798 S.W.2d 560 (Tex. 1990) (even where Commission's final order purported to defer issue of prudence of expenses for future resolution, because utility had not met burden of proof in prior docket to show that expenses were prudently incurred, res judicata barred issue's later review by Commission, where no statute authorized Commission to defer and reconsider issue).

[6] In this issue, Entergy also asserts that the Commission erroneously interpreted Public Utility Regulatory Act (PURA) section 39.462(a) to "require" it to resolve the issue of hurricane-

### B.    *Adjustments for anticipated "purchased capacity" costs*

In its second issue, Entergy contends that the Commission's disallowance of over $30 million of its anticipated expenses for purchasing "capacity" (generated power) from third parties ("purchased-capacity costs"[7]) was not supported by substantial evidence. The Commission responds that Entergy failed to meet its burden to prove that its projected capacity costs were "known and measurable changes" to the costs incurred during the test year, *see* 16 Tex. Admin. Code § 25.231(b) ("In computing an electric utility's allowable expenses, only the electric utility's historical test year expenses as adjusted for known and measurable changes will be considered."), and that it properly exercised its broad discretion in disallowing the expenses, *see Cities of Corpus Christi v. Public Util. Comm'n*, No. 03-06-00585-CV, 2008 WL 615417 at *9 (Tex. App.—Austin Mar. 5, 2008, no pet.) (mem. op.) ("The Commission may decide in its discretion whether to incorporate 'known and measurable' changes to the test-year data."); *Central Power & Light/Cities of Alice v. Public Util. Comm'n*, 36 S.W.3d 547, 563 (Tex. App.—Austin 2000, pet. denied) ("[T]he

---

reconstruction costs in Docket 37744 rather than in the present docket on appeal. *See* Tex. Util. Code § 39.462(a) ("An electric utility subject to this subchapter is entitled to recover hurricane reconstruction costs consistent with the provisions of this subchapter and is entitled to seek recovery of amounts not recovered under this subchapter, including hurricane reconstruction costs not yet incurred at the time an application is filed under Subsection (b), *in its next rate case proceeding or through any other proceeding authorized by Subchapter C*, Chapter 36." (emphasis added)). Because we conclude that substantial evidence supports the Commission's determination that Entergy already sought and recovered the amounts in dispute, we need not address this statutory argument because it pertains only to *unrecovered* amounts.

[7] "Capacity costs" represent the seller's fixed costs in generating power, *see City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 898 (Tex. App.—Austin 1993, writ denied), and they are generally recoverable in base rates, *see City of El Paso v. Public Util. Comm'n*, 344 S.W.3d 609, 614 (Tex. App.—Austin 2001, no pet.).

9

Commission's authority to allow post-test-year adjustments for 'known and measurable changes to historical test-year data' is discretionary."). We agree with the Commission.

In this case, Entergy demonstrated that it incurred purchased-capacity costs of over $245 million for the test year; it sought an additional $31 million based upon what it believed it would incur through purchased-capacity agreements during the "rate year"—the first year that new rates set by the case would take effect. Several parties opposed Entergy's request for this adjustment to test-year expenses and submitted testimony to support their opposition, arguing that the additional rate-year costs were mere projections, not "known and measurable changes." Such evidence showed the following: (1) many of the payments that Entergy claimed it would pay under third-party purchased-capacity contracts in the future did not contain fixed-price terms, and Entergy's costs would fluctuate based on factors such as availability and performance; (2) Entergy's projections under these purchased-capacity contracts contained assumptions about availability and performance that were not supported by historical payments for third-party contracts; (3) Entergy's costs under its purchased-capacity contracts with affiliates would also fluctuate, based on a complicated formula set out in a Federal Energy Regulatory Commission (FERC) tariff with multiple variables, unknown at the time of the rate case; (4) some purchased-capacity contracts at issue had not yet received requisite regulatory approval and did not have set pricing, awaiting development of future pricing schedules; and (5) Entergy's expected load growth in the coming years, including the rate year, would likely offset or completely outpace its projected future purchased-capacity costs.[8]

---

[8] Entergy correctly notes that the Commission is not *directly* authorized by the Legislature to consider future load growth in setting base rates; however, neither has the Legislature directed the

The Commission was free to weigh this and other evidence, and we may not substitute our judgment for its on the weight of the evidence. *See Central Power & Light*, 36 S.W.3d at 561; *see also Charter-Med. Dall.*, 665 S.W.2d at 452–53 (even if court would reach different conclusion from one agency reached, court must uphold agency's decision if it is within bounds of reasonableness). The ALJs considered the evidence before them and concluded that Entergy "failed to meet its burden to prove that the adjustment it seeks to its Test year [purchased-capacity contracts] is known and measurable" and found that the intervenors had "presented substantial evidence that all of the components of [Entergy]'s purchased power capacity contain significant variability and uncertainty in costs." The Commission agreed with the ALJs and denied Entergy's request. We hold that substantial evidence supports the Commission's determination and accordingly overrule Entergy's second issue. *See Charter-Med. Dall.*, 665 S.W.2d at 452 (substantial evidence requires only more than mere scintilla of evidence, and we must affirm agency decision if rational basis for it exists in record).

## C.    Adjustments for anticipated "transmission equalization" expenses

In its third issue, Entergy contends that the Commission's refusal to make adjustments to Entergy's test-year level of "transmission equalization" expenses[9] was not supported by substantial

---

Commission to consider projected future expenses. *See Central Power & Light Co/Cities of Alice. v. Public Util. Comm'n*, 36 S.W.3d 547, 564 (Tex. App.—Austin 2000, pet. denied) (upholding Commission's decision to deny post test-year adjustment that failed to take into account attendant impacts of increased electricity sales from load growth).

[9] "Transmission equalization" refers to the allocation of operating costs among various Entergy operating companies (located in several southern states) for shared use of Entergy's transmission grid. The costs of operating this system are allocated pursuant to a FERC tariff, referred to by the parties as Service Schedule MSS-2, and designed to ensure that each company

11

evidence. The Commission responds that, as with the purchased-capacity costs, Entergy failed to meet its burden to prove that the requested expenses were "known and measurable." *See* 16 Tex. Admin. Code § 25.231(b). Entergy sought to recover $9 million more for transmission-equalization expenses than it incurred in the test year, seeking these adjustments based on its estimates of transmission-construction projects expected to be completed after the test year and incurred in the rate year.[10]

Expert witnesses testifying on behalf of the Commission and intervening parties opposed Entergy's request and identified several "unknowns" with respect to the request: (1) the transmission-equalization formula is complex and involves the input of a number of interdependent variables from the various operating companies, including things such as each company's future transmission investment, deferred taxes, depreciation reserves, and costs of capital; (2) Entergy's post-test-year adjustment was predicated on a calculation that required numerous predictions about these unknown future variables; and (3) the projected expenses were premised on transmission projects that were not yet in service and were in varying stages of design and construction, some with completion dates of six months after Entergy's new rates would go into effect, and in-service

---

contributes its just and reasonable share of the costs. Depending on varying transmission capacity and needs among the individual operating companies—for instance, some months Entergy may be "long" (owning more capacity than it needs) or "short" (owning less than it needs)—the companies pay or receive MSS-2 payments from or to one another, and the payments that Entergy makes when it is "short" are recoverable in its rates.

[10] During the test year, Entergy was "short" and paid more than $1.7 million in MSS-2 payments to the other operating companies. The additional $9 million that Entergy requested as post-test-year adjustments was based on its estimates of transmission-construction projects expected to be completed after the test year, resulting in changes to the relative transmission-line-ownership ratios among the operating companies, with the apparent result that Entergy would be increasingly "short" and its MSS-2 payments would grow.

12

dates are not guarantees and can change, while investment for MSS-2 purposes is not counted until projects actually go into service.

Based on this and other evidence, the ALJs concluded that Entergy did not meet its burden to prove that the adjustments it was seeking were for "known and measurable" changes, and the Commission agreed. As discussed with respect to Entergy's previous issue, the Commission was the sole judge of the weight of the evidence, and we may not substitute our judgment for its. *See Central Power & Light*, 36 S.W.3d at 561. We conclude that substantial evidence supports the Commission's determination, and we accordingly overrule Entergy's third issue. *See Charter-Med. Dall.*, 665 S.W.2d at 452.

**The Commission's issue**

In its sole issue, the Commission contends that the trial court erred in reversing its order on the question of whether it properly used a contemporaneous "line loss study"[11] in Entergy's fuel reconciliation[12] rather than the same, historical study that it used in previously setting Entergy's

---

[11] A "line loss study" estimates the amount of electricity that is lost through transmission as a utility delivers it from the generator to the end-user. The cost for generating that lost electricity is billed to customers so that the utility can recover its reasonable and necessary expenses. Based on the study, different "loss factors" are computed to allocate the losses to the utility's various rate classes, based on the voltage at which the electric service is provided, and the loss factors are incorporated into the "fuel factor," a temporary rate (or "rider") included in the rates that customers pay. *See, e.g.*, 16 Tex. Admin. Code §§ 25.237(a)(1) (Pub. Util. Comm'n, Fuel Factors) ("Fuel factors must account for system losses and for the difference in line losses corresponding to the voltage at which the electric service is provided."), .237(a)(3) ("Fuel factors are temporary rates," subject to periodic review for the reasonableness of fuel costs that a utility has incurred.).

[12] A fuel reconciliation is a periodic proceeding in which the Commission makes adjustments to a utility's rates to account for fluctuations in the cost of fuel, which is volatile and constitutes a large part of a utility's expenses. The Commission uses a two-step process to allow recovery for fuel expenses: (1) first, the Commission sets a temporary, estimated rate called a "fuel factor" and (2)

fuel factor and which Entergy proposed using. Entergy's application to change rates in the docket before us on appeal also included a request for a fuel reconciliation for the period from July 2009 to June 2010 (the "reconciliation period"). *See* 16 Tex. Admin. Code § 25.236(b) (Pub. Util. Comm'n, Recovery of Fuel Costs) ("Electric utilities shall file petitions for reconciliation on a periodic basis so that any petition for reconciliation shall contain a maximum of three years and a minimum of one year of reconcilable data and will be filed no later than six months after the end of the period to be reconciled."); *see also* Tex. Util. Code § 36.203(e) ("The Commission by rule shall provide for the reconciliation of a utility's fuel costs on a timely basis."). Entergy determined that it had over-recovered its fuel costs during the reconciliation period by about $243 million; established that it had already refunded about $237 million of that amount in accordance with interim Commission orders; and sought to "roll forward" the remaining fuel over-recovery balance of approximately $5.6 million "to serve as the beginning balance for the next Reconciliation Period," rather than refund that amount to customers.

---

later, the Commission makes adjustments to the utility's rates by reconciling the amounts the utility received under the fuel factor with the actual, reasonable expenses that the utility incurred for fuel to generate electricity for its customers. *See Texas Utils. Elec. Co. v. Public Util. Comm'n*, 881 S.W.2d 387, 411–12 (Tex. App.—Austin 1994), *aff'd in part, rev'd in part*, 935 S.W.2d 109 (Tex. 1996). In a fuel reconciliation, the utility may ask to refund any over-recovery or surcharge any under-recovery, and those refunds or surcharges will be allocated to different rate classes based on the usage of each class, adjusted for line losses. *See* 16 Tex. Admin. Code §§ 25.236(e)(3) (Pub. Util. Comm'n, Recovery of Fuel Costs) ("Interclass allocations of refunds and surcharges . . . shall be based on the historical kilowatt-hour usage of each rate class . . . adjusted for line losses . . ."), .237(a)(3)(A) (Public Util. Comm'n, Fuel Factors) ("The reasonableness of the fuel costs that an electric utility has incurred will be periodically reviewed in a reconciliation proceeding, as described in § 25.236 of this title, and any disallowed costs resulting from a reconciliation proceeding will be reflected in the calculation of the utility's recoverable fuel and over/(under) collections.").

The dispute between the parties concerns whether the Commission properly followed the recommendation of the intervenor Cities[13] to use a contemporaneous (2010) line-loss study that Entergy presented during this ratemaking proceeding to support its cost-of-service analysis for its requested base rates or whether the Commission should have used the same line-loss study from 1997 that was used when it approved the fuel factor for the reconciliation period. The resolution of the parties' dispute turns on construction of the Commission's rules applying to fuel reconciliations, as the ALJs and the district court noted.

The ALJs rejected the Cities' "unprecedented" recommendation that the Commission use the contemporaneous line-loss study in allocating Entergy's fuel costs actually incurred over the reconciliation period. The Cities recommended using the newer 2010 study because its expert witness, Carl Nalepa, explained that allocating Entergy's fuel expenses between retail and wholesale customers using the more recent loss factors revealed that retail customers were "subsidizing" wholesale customers in the approximate amount of $3.8 million. According to the Cities, updating Entergy's allocation of fuel costs to reflect current line losses would result in a more accurate amount that Entergy actually expended to provide service to *retail* customers (rather than to wholesale customers) over the reconciliation period. The ALJs rejected the Cities' proposal, determining that (1) its recommendation would result in a "mismatch" between the allocation of fuel costs to customer classes and the already-received collections from those customers for fuel costs (which were determined through the use of historical line losses) and (2) the Commission's

---

[13] The Cities of Bridge City, Groves, Orange, Pine Forest, and West Orange (the Cities)—all municipalities in the service territory of Entergy—filed a joint motion to intervene in the rate-case, which the Commission granted.

15

rules "require the use of Commission-approved line losses that were in effect at the time fuel costs were billed to customers in a fuel reconciliation." *See* 16 Tex. Admin. Code § 25.236(e)(3) ("Interclass allocations of refunds and surcharges, including associated interest, shall be developed on a month-by-month basis and shall be based on the historical kilowatt-hour usage of each rate class for each month during the period in which the cumulative under- or over-recovery occurred, *adjusted for line losses using the same commission-approved loss factors that were used in the electric utility's applicable fixed or interim fuel factor*." (emphasis added)).

In its final order, the Commission agreed with the Cities and reversed the PFD on the issue, determining that the "same currently available [2010] line-loss factors [that Entergy used to calculate demand- and energy-related allocations in its cost-of-service analysis supporting its requested base rates] should have been utilized in Entergy's fuel reconciliation." Based on using the contemporaneous line-loss study, the Commission determined that approximately $3.8 million should be removed from Entergy's recoverable fuel expenses. While adding a new finding of fact and conclusion of law to reflect this determination,[14] the Commission did not revise any of the PFD's findings of fact reciting that Entergy's fuel expenses incurred during the reconciliation period were "reasonable and necessary . . . to provide reliable electric service to retail customers" or its legal

---

[14] The new finding of fact, number 246A, reads: "E[ntergy]'s 2010 line-loss factors should be used to reconcile [its] fuel costs. Therefore, E[ntergy]'s fuel reconciliation over-recovery should be reduced [sic—Entergy submits that the word should read "increased," and the Commission does not disagree] by $3,981,271." The new conclusion of law, number 19B, reads: "R[ule] 25.236(d)(2) defines the scope of a fuel reconciliation proceeding to include any issue related to the reasonableness of a utility's fuel expenses and whether the utility has over- or under-recovered its reasonable fuel expenses. It is proper to use the new line-loss study to calculate Entergy's fuel reconciliation and over-recovery."

16

conclusion to the same effect. *See id.* § 25.236(d)(1)(A) ("In a proceeding to reconcile fuel factor revenues and expenses, an electric utility has the burden of showing that: its eligible fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers."). In short, the Commission did not determine that Entergy *had not* reasonably or actually incurred the $3.8 million in fuel expenses, but, rather, that those expenses—using new line-loss data—should be allocated to wholesale customers rather than retail customers and, therefore, removed from the "pot" of expenses to be reconciled with revenues. The Commission did not provide for any procedure through which Entergy would be credited for the $3.8 million it indisputably spent on fuel expenses and that its expert witness testified would be "stranded" if disallowed.

The district court reversed the Commission's determination concerning use of the contemporaneous line-loss study and $3.8 million adjustment to Entergy's over-recovery, upholding Entergy's issue in which it asserted that the Commission violated two of its rules in using the 2010 study. *See id.* §§ 25.236(e)(3) (providing for methods to be used in developing interclass allocations of fuel refunds and surcharges), .237(a), (c)(2)(B) (Pub. Util. Comm'n, Fuel Factors) (providing for use and calculation of fuel factors and scope of fuel-factor-revision proceeding). We agree with the district court and the ALJs that by using the 2010 line-loss study, the Commission did not follow the plain, unambiguous language of its own rule 25.236(e)(3) in reconciling Entergy's fuel costs and, thereby, acted arbitrarily. *See Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 199 (Tex. App.—Austin 2004, pet. denied) (agency decision is arbitrary when it fails to follow clear, unambiguous language of its own regulations); *Southwest Pharmacy Sols., Inc. v. Texas Health & Human Servs.*, 408 S.W.3d 549, 558 (Tex. App.—Austin 2013, pet. denied)

17

(courts will not defer to agency's interpretation of its own rules if interpretation is plainly erroneous or contradicts text); *see also Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207, 211 (Tex. 1991) (in reviewing decision for arbitrariness, we may not substitute our judgment for that of agency, and our review is limited to determining whether administrative interpretation is "plainly erroneous or inconsistent with the regulation").

Rule 25.236(e)(3) unambiguously provides that under- and over-recoveries of fuel expenses shall be allocated to different rate classes and adjusted for line losses using the *same* Commission-approved loss factors that were used in setting the fuel factor:

> Interclass allocations of refunds and surcharges, including associated interest, shall be developed on a month-by-month basis and shall be based on the historical kilowatt-hour usage of each rate class for each month during the period in which the cumulative under- or over-recovery occurred, adjusted for line losses using the same commission-approved loss factors that were used in the electric utility's applicable fixed or interim fuel factor.

16 Tex. Admin. Code § 25.236(e)(3). The Commission contends that this rule is inapplicable because (1) Entergy was not seeking to refund its over-recovery (but only to carry it forward as a balance into the next fuel reconciliation) and (2) it applies only to Entergy's retail-rate classes and "does not concern allocating fuel costs between retail and wholesale service."

While it is true that Entergy did not seek to outright refund its over-recovery, its proposal to carry the balance forward is effectively a "refund" and will be the starting point for determining over- or under-recoveries going forward. The various customer classes will nonetheless receive the benefit of any dollars they overpaid, allocated appropriately to each class, under this rule when the next fuel reconciliation occurs. Furthermore, the rule does not speak to the actual

18

issuance of refunds or imposition of surcharges, but instead to "allocations" of them to various classes—whether and whenever the utility actually makes a refund or collects a surcharge from its various customer classes (or merely rolls the balance forward), the utility must nonetheless make regular allocations of the over- or under-recoveries to its customer classes and maintain those amounts on its books until reconciled. *See id.* ("Interclass allocations of refunds and surcharges, including associated interest, shall be developed on a month-by-month basis . . . ."); *cf. id.* 25.236(e)(5) ("Unless otherwise ordered by the commission, all refunds shall be made through one-time bill credit and all surcharges shall be made on a monthly basis . . . .").

As for the Commission's argument that Rule 25.236(e)(3) does not apply because it does not concern allocating costs between retail and wholesale classes but only applies to allocations among various retail customers, that contention directly conflicts with the rule's specific definition of "rate class" as meaning "all customers taking service under the same tariffed rate schedule." *Id.* § 25.236(e)(2). Both retail and wholesale customers take service under tariffed rate schedules, although the Commission does not itself set the wholesale tariffed base rates (FERC does). Neither this rule nor any rule or statute the Commission has identified prohibits the utility from recovering costs merely because those costs were incurred to provide energy to wholesale rather than retail customers. *Cf.* 16 Tex. Admin. Code §§ 25.231(a), (b) (rates are to be based on electric utility's cost of rendering service "to the public" during historical test year, and allowable expenses are those "reasonable and necessary to provide service to the public"), .235(a) (Pub. Util. Comm'n, Fuel Costs—General) (Commission must set utility's rates at level that will permit utility "a reasonable opportunity to earn a reasonable rate of return on its invested capital and to recover its reasonable and necessary expenses, including the cost of fuel and purchased power").

19

Moreover, the same rule also contemplates that a utility will make refunds to or collect surcharges from *all* customer classes, *including* wholesale classes, *see id.* § 25.236(e)(4) (noting that all wholesale customers shall be given refunds or assessed surcharges based on their individual actual historical usage), and undoubtedly *both* retail and wholesale customers *paid* the fuel factor and contributed to revenues during the reconciliation period. Furthermore, in subsection (a) of Rule 25.236, there is a limited list of "eligible fuel expenses" for which a utility may seek recovery, *see id.* § 25.236(a); the list does not mention expenses incurred for energy produced that is delivered only to retail customers. In sum, the Commission has not advanced any convincing arguments that Rule 25.236(e)(3) does not apply to Entergy's fuel reconciliation, nor has it offered an alternate, reasonable interpretation of the phrase "*using the same commission-approved loss factors* that were used in the electric utility's applicable fixed or interim fuel factor." The loss factors that were used in setting Entergy's fuel factor relevant to the fuel reconciliation at issue are the 1997 loss factors that Entergy proposed using to reconcile its fuel costs. The rule unambiguously requires the Commission to use these *same* 1997 factors in calculating the amount of refund that Entergy may carry forward on its books.

Despite Rule 25.236(e)(3)'s directive, the Commission relies on the rule's subparagraphs (d)(1)(A) and (d)(2) to support its determination. However, the first of those subparagraphs recites merely that the utility has the burden of proving that its eligible fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers, *see id.* § 25.236(d)(1)(A). The Commission explicitly found that Entergy had met this burden in its findings of fact and conclusions of law.

20

Moreover, even had the Commission not made these explicit findings, we are not convinced by its contention that subparagraph (d)(1)(A) permits the Commission to deduct the actual expenses for providing electricity to wholesale customers from the "pot" of total fuel expenses that a utility incurred—such allocation among classes is the very purpose of subparagraph (e) and its specific outline of procedures for so doing.

The other subparagraph, (d)(2), cited by the Commission merely recites that the "scope of a fuel reconciliation proceeding includes any issue related to determining the reasonableness of the electric utility's fuel expenses during the reconciliation period and whether the electric utility has over- or under-recovered its reasonable fuel expenses," *see id.* § 25.236(d)(2). The Commission supports its decision to exclude $3.8 million from Entergy's fuel expenses incurred during the reconciliation period by arguing that whether the expenses were incurred to provide energy to retail or wholesale customers is "related" to whether it has "over- or under-recovered" its fuel expenses. There is no basis in subparagraph (d)(2) for the Commission's contention that this retail–wholesale distinction is relevant to whether a utility has over- or under-recovered its fuel expenses. There is no dispute that Entergy *did* over-recover its fuel expenses. Moreover, as already noted, the Commission's determination is directly at odds with the more specific directive in subparagraph (e) of the same rule to adjust allocations of refunds using the *same* line-loss factors that were used in setting the fuel factor.[15]

---

[15] The Commission alternatively argues that Entergy was not harmed by its determination on this issue. *See* Tex. Gov't Code § 2001.174(2) (directing court to "reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced"). However, Entergy's expert witness testified that if the costs were disallowed, they would be "stranded" and not recovered otherwise, and the Commission has identified no record evidence indicating other

The Commission acted arbitrarily and abused its discretion by not following Rule 25.236(e)(3), using the 2010 line-loss study to reconcile Entergy's fuel costs, and disallowing $3.8 million of Entergy's eligible fuel expenses incurred during the reconciliation period in determining the amount of refunds that Entergy may keep on its balance sheets. We overrule the Commission's issue and hold that the district court did not err in reversing the Commission's determination on the issue of the line-loss study and remanding the issue for further proceedings consistent with the district court's order.

**OPUC's issue**

In its sole issue, OPUC contends that the Commission committed legal error, acted arbitrarily and capriciously, and abused its discretion by allowing the inclusion of about $13 million of 1997 ice-storm restoration costs in Entergy's storm-reserve account because the costs were allegedly directly related to Entergy's imprudence and were reasonably anticipated. Entergy and the Commission respond that OPUC's argument hinges on two false premises: (1) that the Commission determined in a prior docket that some of Entergy's $13 million in 1997 ice-storm costs were imprudently incurred and (2) that Entergy presented no evidence demonstrating the reasonableness and necessity of the $13 million in costs associated with the 1997 ice storm. Our review of the record leads us to agree with Entergy and the Commission. While OPUC frames its issue in various ways, it essentially is asking this Court to re-weigh the evidence before the ALJs and Commission, which we may not do. *See Central Power & Light*, 36 S.W.3d at 561 (agency is sole judge of weight

procedures through which Entergy would recoup them.

to be accorded testimony of each witness); *see also Charter-Med. Dall.*, 665 S.W.2d at 452–53 (even if court would reach different conclusion from one agency reached, court must uphold agency's decision if it is within bounds of reasonableness).

The prior docket to which OPUC cites, Number 18249, was severed from a 1996 rate case for the purpose of hearing and resolving issues relating to Entergy's service quality after it had merged with Gulf States Utilities, Inc. A small portion of the order in Docket Number 18249 addressed the 1997 ice storm and found that Entergy's service-quality issues (such as poor vegetation management in failing to trim trees above transmission lines) contributed to the extent of the ice-storm damage. However, the Commission also found that significant damage would have occurred even with exemplary vegetation-management and other preventive measures. Significantly, the Commission did not address the prudence of the ice-storm restoration costs (or of any particular expenditure) or conclude that any portion of the restoration costs should be disallowed; in fact, it did not adjudicate cost-recovery issues at all in Docket 18249 but did penalize Entergy for its deficient maintenance and other forms of poor service quality by requiring it to retroactively reduce its return on its equity (ROE) by making refunds to customers.

Nonetheless, OPUC essentially argues that the Commission's findings in Docket 18249 regarding the ice storm estop it from allowing recovery for ice-storm restoration expenditures in this docket. However, none of the actual expenditures that Entergy incurred to restore its system after the 1997 ice storm nor the prudence of those particular expenditures were at issue in the prior docket or were essential to the Commission's decision in that docket. *Cf. El Paso Elec. Co. v. Public Util. Comm'n*, 917 S.W.2d 846, 859 (Tex. App.—Austin 1995, writ dism'd by agr.) (to invoke

23

collateral estoppel, party must establish that (1) facts sought to be litigated in second action were fully and fairly litigated in prior action and (2) those facts were essential to judgment in first action). We conclude that Entergy was not estopped by Docket Number 18249 from requesting the ice-storm restoration costs in this docket.

Regarding whether Entergy met its burden in this docket to show that its ice-storm restoration costs were reasonable and necessary and were not reasonably anticipated, we conclude that substantial evidence supports the Commission's determination in favor of Entergy. Entergy witness Shawn Corkran described the severity of the storm and the area affected; detailed the work performed to restore the system; described how the accumulation of ice caused many of the distribution lines to collapse, without regard to damage from falling tree limbs; described the company's response to the damage, including hiring numerous contractors to assist with the restoration effort; and described how he evaluated the reasonableness of the costs that were incurred during the restoration effort. Entergy witness Michael Considine opined that Entergy could not have reasonably anticipated the costs because annual expenditures are extremely variable, both in amount and with respect to timing.

OPUC did not challenge any specific item in the requested restoration expenses but rather relied upon the Commission's findings in Docket 18249 and its insistence that Entergy failed to make a prima facie case that its ice-storm restoration costs were prudently incurred. *See Entergy Gulf States, Inc. v. Public Util. Comm'n*, 112 S.W.3d 208, 214–15 (Tex. App.—Austin 2003, pet. denied) (utility has burden to establish prima facie case of prudence of expenses; if utility makes such case, burden shifts to intervenor to present evidence that reasonably challenges expenditure). However, the utility may meet its burden without proving the reasonableness and

24

necessity of every individual dollar paid on a granular level, but may present evidence that is comprehensive. *Id.* at 215 n.5.

To support its prima facie case, Entergy submitted evidence of the costs it incurred to restore service to customers as quickly as possible after the ice storm and expert testimony that such expenses were reasonable and necessary to repair the damage and restore power. Entergy witness Corkran discussed Entergy's distribution operations, industry-recognized comprehensive storm plans, annual storm drills, storm response and restoration processes, distribution maintenance and asset-improvement processes, service quality and continuous-improvement programs, and vegetation-management practices. He described how Entergy prepares for emergency situations and how charges to the storm reserve are captured and recorded. He also submitted exhibits showing that Entergy's operation and maintenance costs for distribution compare very favorably to the costs of other utilities.

Because there is substantial evidence supporting the Commission's determination on the issue of ice-storm restoration costs, and because Entergy was not estopped from recovering these costs by prior Docket Number 18249, we overrule OPUC's sole issue and hold that the district court properly upheld the Commission's order on these costs.

## CONCLUSION

Having overruled all of Entergy's issues, the Commission's issue, and OPUC's issue, we affirm the judgment of the district court reversing and remanding the Commission's final order on the issue of its use of a contemporaneous line-loss study to adjust Entergy's recoverable fuel expenses for the reconciliation period and upholding the Commission's final order in all other respects.

25

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Affirmed

Filed:   April 8, 2016