**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Duke Energy Ohio, Inc.*, Slip Opinion No. 2026-Ohio-2064.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-2064

IN RE APPLICATION OF DUKE ENERGY OHIO, INC., FOR AN INCREASE IN ITS NATURAL GAS RATES; OFFICE OF THE OHIO CONSUMERS' COUNSEL, APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE; DUKE ENERGY OHIO, INC., INTERVENING APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Duke Energy Ohio, Inc.*, Slip Opinion No. 2026-Ohio-2064.]**

*Public utilities—Public Utilities Commission did not err in permitting utility to recover from customers through rates the costs associated with retiring its propane caverns—Costs of retiring propane caverns recoverable by utility under R.C. 4909.15(A)(4) as a cost of rendering public-utility service—Commission's order affirmed.*

(No. 2024-1505—Submitted October 7, 2025—Decided June 5, 2026.)

APPEAL from the Public Utilities Commission, Nos. 22-507-GA-AIR, 22-508-GA-ALT, 22-509-GA-ATA, and 22-510-GA-AAM.

_____

BRUNNER, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, HANNI, HAWKINS, and SHANAHAN, JJ., joined. MARK A. HANNI, J., of the Seventh District Court of Appeals, sat for DETERS, J.

**BRUNNER, J.**

{¶ 1} Appellant, the Office of the Ohio Consumers' Counsel ("OCC"), appeals an order of appellee, the Public Utilities Commission of Ohio, allowing intervening appellee, Duke Energy Ohio, Inc. ("Duke Energy" or "the company"), to charge its customers higher natural-gas distribution rates. At issue is whether Duke Energy may recover from customers certain costs relating to the retirement of the company's propane caverns. For over 60 years, Duke Energy relied on the caverns to store propane that it used as a seasonal source of natural-gas supply. However, after Duke Energy constructed a new pipeline, the company retired the caverns. The commission subsequently permitted Duke Energy to recover from customers through rates the costs associated with retiring the caverns. Specifically, the commission determined that those costs were recoverable under R.C. 4909.15(A)(4) as a cost of rendering public-utility service.

{¶ 2} On appeal, the OCC argues that the commission should have analyzed whether those costs were recoverable under R.C. 4909.15(A)(1)'s "used and useful" standard and that because the caverns did not meet that standard, Duke Energy should have been prohibited from recovering at least a portion of the costs relating to the retirement of the propane caverns. For the reasons explained below, we affirm the commission's order.

## I. BACKGROUND

### A. Duke Energy's Propane Caverns

{¶ 3} Duke Energy is a public utility in the business of supplying natural gas to approximately 450,000 customers in southwestern Ohio. As early as 1959, Duke Energy relied on human-made caverns to store propane that it used, along

with related propane-air facilities, to provide a seasonal source of gas supply and to support system pressures during the winter heating season. On peak-demand days, the propane facilities provided about 10 percent of the natural-gas supply.[1]

{¶ 4} In 2016, the company sought a certificate from the Ohio Power Siting Board to construct a new natural-gas pipeline in Hamilton County, the C314V Central Corridor Pipeline Extension Project, as a part of its long-term plan to retire the propane caverns. *See In re Application of Duke Energy Ohio, Inc., for a Certificate of Environmental Compatibility & Public Need for the C314V Cent. Corridor Pipeline Extension Project*, Power Siting Bd. No. 16-253-GA-BTX ("Duke Energy's 2016 power-siting case"). Duke Energy claimed that the caverns were reaching the end of their useful life, that they were incapable of being repaired, and that the pipeline would provide additional natural-gas capacity for the company's network along with a more reliable method of delivery.

{¶ 5} The board granted Duke Energy a certificate for construction of the pipeline in an order that we affirmed in *In re Application of Duke Energy Ohio, Inc.*, 2021-Ohio-3301. Duke Energy completed construction of the pipeline and officially placed it into service on March 14, 2022.

### B. The Abandonment-and-Deferral Case

{¶ 6} Under R.C. 4905.20 and 4905.21, a public utility desiring to abandon certain facilities must first obtain the commission's approval. In 2021, Duke Energy filed an application with the commission seeking authority to abandon the propane caverns ("the Abandonment-and-Deferral Case"), stating that the Central Corridor Pipeline would enable the company to retire the caverns while also maintaining safe and reliable service to customers. In the same application, Duke Energy sought authority for its proposed accounting treatment of the costs associated with retiring the propane caverns.

---

1. "Peak demand" refers to the time at which the most energy is being consumed simultaneously across the utility's system. *See In re Application of Ohio Edison Co.*, 2019-Ohio-4196, ¶ 4.

{¶ 7} Duke Energy and the commission staff ("staff") entered into a stipulation, which the commission ultimately approved and adopted. *In re Application of Duke Energy Ohio, Inc., for Authority to Change Accounting Methods and to Abandon Certain Propane-Air Facilities*, PUCO Nos. 21-1035-GA-AAM and 21-986-GA-ABN, 2022 WL 7431401, *1, 7 (Oct. 5, 2022). Under the stipulation, staff agreed with the company's request to abandon the propane caverns and to establish a "regulatory asset account"[2] for recovery and deferral of certain costs relating to retiring the propane caverns. *Id.* at *5. Specifically, the parties agreed that Duke Energy would be permitted to defer (1) the remaining undepreciated net book value of the company's Ohio-based propane caverns that had not yet been recovered through rates at the time the caverns were retired, (2) an estimate of costs incurred to decommission the caverns, and (3) costs relating to the remaining propane inventory in the caverns. The stipulation further required Duke Energy to seek recovery of those deferred costs in its next distribution base-rate case, propose an amortization period of no less than ten years to recover the deferred costs, and bear the burden of demonstrating the prudency of the deferred costs.

{¶ 8} The propane caverns were disconnected from Duke Energy's natural-gas system on April 12, 2022, and officially retired three days later, after which the company commenced decommissioning activities.

---

2. None of the parties has provided a definition of a "regulatory asset account." In the public-utility context, other courts have described a regulatory asset as an accounting mechanism allowing the utility company to carry a cost on its books as an asset based on the expectation that it will be permitted to seek recovery of the cost in future rates over a period of time. *See Entergy Texas, Inc. v. Pub. Util. Comm. of Texas*, 490 S.W.3d 224, 229, fn. 2 (Tex.Ct.App. 2016); *Office of Consumer Counsel v. Dept. of Pub. Util. Control*, 279 Conn. 584, 594 (Conn. 2006); *see also* R.C. 4905.301 (relating to costs incurred by public utilities "as a result of a governmental entity's regulation of the public utility's occupancy or use of a right of way").

### C. This Proceeding: Duke Energy's Distribution Base-Rate Case

{¶ 9} In June 2022, Duke Energy filed an application for an increase in natural-gas distribution rates.[3] Regarding the propane caverns, the company requested recovery of the amount deferred in the Abandonment-and-Deferral Case, approximately $29 million, amortized over ten years. In other words, Duke Energy sought to charge ratepayers roughly $2.9 million a year for ten years to recover the deferred costs associated with retiring the propane caverns.

{¶ 10} The OCC and several other parties intervened in the rate proceeding. Staff investigated Duke Energy's application and issued a comprehensive written report. Duke Energy, staff, and all other parties except the OCC entered into a wide-ranging stipulation intending to resolve all the issues in the case. The parties agreed that Duke Energy's application should be approved as modified by the stipulation and the recommendations in the staff report, including that the company be permitted to recover the full amount deferred from the Abandonment-and-Deferral Case.

{¶ 11} After an evidentiary hearing, the commission adopted the stipulation. 2023 WL 7301331, *1-2. With respect to the propane caverns, the commission found that the costs of winding down operations and decommissioning the caverns were recoverable under R.C. 4909.15(A)(4), which allows utilities to recover "[t]he cost to the utility of rendering the public utility service for the test period . . . ." *Id.* at *8-10. The commission rejected the OCC's argument that the caverns should be subject to R.C. 4909.15(A)(1), which permits utilities to recover through customer rates the value of its property that is "used and useful" in rendering public-utility service. *Id.* But the commission said that even if R.C. 4909.15(A)(1)'s used-and-useful test applied, the caverns would properly be

---

3. Duke Energy's filing included four separate applications, but there are no appellate issues relating to the other applications. For simplicity's sake, we refer to the entire proceeding as Duke Energy's distribution base-rate case.

considered used and useful and therefore the deferred costs would be recoverable under that section. *Id.* at *10.

**{¶ 12}** After the commission denied the OCC's rehearing applications, the OCC filed this appeal. Duke Energy intervened as an appellee in support of the commission's order. The company later moved to dismiss the appeal, which we denied in June 2025. 2025-Ohio-2082.

## II. STANDARD OF REVIEW

**{¶ 13}** R.C. 4903.13 provides that a commission order shall be reversed, vacated, or modified by this court only when, on consideration of the record, the court finds the order to be unlawful or unreasonable. *See also Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 2004-Ohio-6767, ¶ 50. The appellant bears the burden of demonstrating that the commission's order is unlawful or unreasonable. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 51 Ohio St.3d 150, 154 (1990).

**{¶ 14}** A commission order is unlawful if it rests on an erroneous interpretation of the law or if the commission fails to follow the procedures prescribed by statute or by a commission rule. *See In re Application of Firelands Wind, L.L.C.*, 2023-Ohio-2555, ¶ 12. This court has "complete and independent power of review as to all questions of law" in appeals from the commission. *Ohio Edison Co. v. Pub. Util. Comm.*, 1997-Ohio-196, ¶ 16.

**{¶ 15}** A commission order is unreasonable when the decision is manifestly contrary to the evidence in the record, when the evidence is clearly insufficient to support the decision, or when the decision is internally inconsistent. *See Firelands Wind* at ¶ 16. A commission order is also unreasonable when the commission's exercise of its discretion in making determinations within broad statutory criteria falls outside the zone of permissible statutory construction. *See id.* at ¶ 15. In adjudicating whether a commission order is unreasonable, we do not reweigh the evidence or second-guess the commission on questions of fact. *In re Complaints*

*of Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 2017-Ohio-7566, ¶ 35. We will not disturb the commission's factual determinations when the record contains sufficient probative evidence to show that the determinations were not manifestly against the weight of the evidence and not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 2004-Ohio-6896, ¶ 29.

### III. ANALYSIS

{¶ 16} The OCC raises three propositions of law. To fully understand the arguments, we begin our analysis with a brief review of Ohio's ratemaking law.

### A. Ohio's Ratemaking Principles

{¶ 17} R.C. 4909.15(A)[4] charges the commission with setting "just and reasonable rates" and provides a mandatory ratemaking formula that requires the commission to make a series of complex determinations. Specifically, R.C. 4909.15(A) states:

> The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges, shall determine:
>
> (1) The valuation as of the date certain of the property of the public utility used and useful . . . in rendering the public utility service for which rates are to be fixed and determined. . . .
>
> . . .
>
> (2) A fair and reasonable rate of return to the utility on the valuation as determined in division (A)(1) of this section;

---

4. We apply the version of R.C. 4909.15 that was in effect in June 2022, when Duke Energy filed its application to increase rates. *See* 2012 Sub.S.B. No. 379. The statute has since been amended, *see* 2024 H.B. No. 226, 2025 Sub.H.B. No. 15, and 2025 Sub.S.B. No. 103, although most of the relevant statutory language at issue in this case remains unchanged.

. . .

     (4) The cost to the utility of rendering the public utility service for the test period . . . .

2012 Sub.S.B. No. 379.

{¶ 18} The valuation required by R.C. 4909.15(A)(1) is commonly referred to as the "rate base," and it represents the public utility's investment in real property, facilities, and other assets (e.g., power plants, pipelines, and software) it uses to serve customers.[5] *In re Application of Duke Energy Ohio, Inc.*, 2017-Ohio-5536, ¶ 19. The parties here also refer to the utility's rate base as "plant." To determine the value of a utility's rate base, the commission must decide to what extent a utility's property is "used and useful" in rendering utility service. A public utility may not include property in its rate base unless the property is actually used and useful in providing service. *See In re Application of Suburban Natural Gas Co.*, 2021-Ohio-3224, ¶ 17.

{¶ 19} R.C. 4909.15(A)(2) requires the commission to determine a "fair and reasonable rate of return" on the utility's rate base. A rate of return is the percentage of return that a utility receives on its assets. *Cleveland v. Pub. Util. Comm.*, 164 Ohio St. 442, 443 (1956).

{¶ 20} R.C. 4909.15(A)(4) requires the commission to determine the cost (e.g., for labor or fuel expenses) that a utility incurs in "rendering the public utility service for the test period." The "test period" is a 12-month period during which the commission monitors the utility's revenues and expenses so that the

---

5. "Rate base" should not be conflated with "base rate," which is another term used throughout the parties' briefs. A public utility's "base rate" is the utility's distribution rate approved by the commission. For example, the underlying matter is referred to as a "distribution base-rate case"— i.e., the formal proceeding before the commission in which a public utility applies to increase its distribution rate, *see In re Application of E. Ohio Gas Co.*, 2023-Ohio-3289, ¶ 4, fn. 1.

commission can make an informed decision on the rate application. R.C. 4909.15(C)(1); *Duke Energy* at ¶ 9, fn. 1.

{¶ 21} In short, the rate base represents the utility's net investment in property and other assets that as of the date certain were used and useful in providing utility service to its customers and upon which the utility is entitled to receive a fair and reasonable rate of return. In a distribution base-rate case, a public utility files an application to increase rates to an amount that will ensure a fair rate of return on the utility's rate base and cover the utility's operating costs. The valuation of a public utility's used-and-useful property (i.e., rate base) under R.C. 4909.15(A)(1) and its costs of providing service under R.C. 4909.15(A)(4) are two separate components of the rate-setting process. Once these determinations are made, the commission must make further computations under R.C. 4909.15 to determine whether a utility is entitled to set new distribution rates. *See* R.C. 4909.15; *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 1999-Ohio-81, ¶ 5.

**B. The Commission Properly Determined That the Deferred Amount Was a Cost of Rendering Public-Utility Service under R.C. 4909.15(A)(4)**

{¶ 22} In its first proposition of law, the OCC contends that the commission misapplied R.C. 4909.15 by permitting Duke Energy to recover $17 million of the $29 million deferred amount—i.e., the portion of the deferred amount attributable to the net book value of the propane caverns—as a cost of rendering public-utility service under R.C. 4909.15(A)(4), rather than subjecting the caverns to the used-and-useful standard under R.C. 4909.15(A)(1).[6] We conclude, based on the record before us, that the commission did not act unlawfully or unreasonably by treating

---

6. On appeal, the OCC does not challenge Duke Energy's ability to recover the remaining portion of the $29 million deferred amount under R.C. 4909.15(A)(4). That is, the OCC has limited its challenge to the recoverability of the portion of the deferred amount attributable to the net book value of the propane caverns at the time of their retirement, which amounted to approximately $17 million. The OCC is not challenging Duke Energy's ability to recover under R.C. 4909.15(A)(4) deferred costs relating to decommissioning the propane caverns (approximately $7 million) or deferred costs relating to propane inventory in the caverns (approximately $5 million).

the entire deferred amount associated with the retirement of the propane caverns as a cost of rendering public-utility service under R.C. 4909.15(A)(4).

*1. The commission did not err by refusing to apply the used-and-useful standard*

{¶ 23} The OCC first asserts that the deferred amount relating to the net book value of the propane caverns was Duke Energy's remaining investment in those facilities and was therefore "plant asset" or "plant investment"—not an expense. As evidence, the OCC points to Duke Energy's 2016 power-siting case, in which the company made clear that the Central Corridor Pipeline would replace the propane caverns and its related facilities. In the OCC's words, "[t]he propane caverns were plant, replaced by other plant, the Central Corridor Pipeline." Because the net book value represented Duke Energy's remaining investment in property, the OCC believes the caverns should have been subjected to the used-and-useful standard in R.C. 4909.15(A)(1) to determine whether they were recoverable in customer rates.

{¶ 24} The OCC is correct that if a utility seeks to recover a capital investment in property, then the commission should apply the used-and-useful standard under R.C. 4909.15(A)(1). *See Duke Energy*, 2017-Ohio-5536, at ¶ 19. But here, the commission had sufficient evidence to conclude that the deferred amount relating to the net book value of the propane caverns was no longer considered a capital investment, but rather an expense on the company's books.

{¶ 25} During the hearing, Sarah E. Lawler, who is a certified public accountant and is vice president of rates and regulatory strategy for Duke Energy, testified that under normal regulatory accounting principles, when an asset is retired within a particular asset group, any remaining net book value of that retired asset is recovered over the remaining assets in the group. But the retirement of the propane caverns was unique because the entire class of assets (i.e., all the caverns) were being taken out of service, so there were no surviving assets in the group to which

to assign or spread the remaining recoverable value. Lawler referred to the caverns as a "dying asset" or "stranded asset." She explained:

> In such a dying asset situation, particularly when there is a large undepreciated balance remaining, it is typical for a regulatory asset to be created for these dying assets that were used to provide service to customers, but, due to adjustments to depreciation expense or life parameters as part of rate proceedings, that were not fully depreciated by the end of their useful life. *The asset is impaired on the utility's books, and that asset's remaining net book value is removed from rate base and reflected as an expense. Because the regulatory asset is created for the expense, the amount is then amortized in base rates and recovered over a reasonable period of time.* Absent this treatment, the utility would be facing a significant write-off, impacting the utility's financial condition, because it would otherwise be unable to recover its costs of providing service to customers. That is why [Duke Energy] sought and eventually received approval to create the deferral for these propane air facilities in the [Abandonment-and-Deferral Case].

(Emphasis added.)

{¶ 26} Lawler further testified that in accordance with the stipulation in the Abandonment-and-Deferral Case, at the end of 2021, Duke Energy removed the remaining net book value of the propane caverns from the company's plant account and created journal entries for the authorized deferrals. When the company sought recovery of those deferrals in the underlying distribution base-rate case, none of the deferred amount was included in rate base under R.C. 4909.15(A)(1). Rather, Duke Energy sought recovery of the entire deferred amount as part of its operating

expenses under R.C. 4909.15(A)(4). Lawler emphasized that by the time the distribution base-rate case was filed, "[t]he deferral balance [did] not include any capital" and Duke Energy was merely seeking the "recovery of an expense."

{¶ 27} The commission approved of Duke Energy's accounting treatment of the deferred amount and concluded that the company's expenses of winding down operations of the caverns were properly considered as costs and therefore not subject to R.C. 4909.15(A)(1)'s used-and-useful standard.

{¶ 28} On appeal, the OCC insists that the portion of the deferred amount relating to the net book value of the propane caverns is "undisputably an investment by the utility, not an expense," and that "R.C. 4909.15(A) unambiguously required [that portion's] treatment as [an] investment." But the OCC does not cite a legal authority, an accounting principle, or expert testimony that sufficiently counters the company's evidence that according to legitimate accounting practices, the deferred amount relating to the net book value of the caverns was considered an expense on the company's books, as opposed to an investment, when Duke Energy filed the underlying distribution base-rate case.

{¶ 29} We have long stated that the rates approved by the commission are presumed fair and reasonable and that a party who contends otherwise has the burden on appeal to this court of showing that the rates are unjust, unreasonable, or unlawful. *AT&T Communications*, 51 Ohio St.3d at 154. We also have observed that the "'members of this court are neither accountants nor engineers'" and that "'it would be unfair to the litigants and to the commission for the court to pretend that it is in a position to better evaluate the evidence and determine the difficult question of the reasonableness of the order than is the commission.'" *Id.*, quoting *Dayton v. Pub. Util. Comm.*, 174 Ohio St. 160, 162 (1962). More must be shown by the OCC to prove that the commission acted unlawfully or unreasonably by not subjecting the caverns to the used-and-useful test under R.C. 4909.15(A)(1).

{¶ 30} However, we note that finding that the used-and-useful test under R.C. 4909.15(A)(1) is inapplicable does not automatically result in the conclusion that the deferred amount is recoverable under R.C. 4909.15(A)(4). The deferred amount must also meet the specific requirements of that subdivision.

2. *The commission did not err in concluding that the deferred amount was a "cost to the utility of rendering the public utility service" under R.C. 4909.15(A)(4)*

{¶ 31} As noted, R.C. 4909.15(A)(4) requires the commission to determine the "cost to the utility of rendering the public utility service for the test period."[7] The OCC contends that the commission erred by permitting recovery of the entire deferred amount under R.C. 4909.15(A)(4), because (1) the net book value of the propane caverns cannot be considered a "cost" to the utility and (2) even if the entire deferred amount were properly characterized as a cost, it was not incurred in "rendering the public utility service for the test period," R.C. 4909.15(A)(4). We disagree.

{¶ 32} First, R.C. 4909.15 does not define "cost." When a word is undefined, we look to the term's plain and everyday meaning, which often entails a review of one or more dictionary definitions, and consider that ordinary meaning in the context of the word's surrounding text. *Suburban Natural Gas Co.*, 2021-Ohio-3224, at ¶ 22; *State v. Bertram*, 2023-Ohio-1456, ¶ 13.

{¶ 33} "Cost" can be understood in a number of ways. Everyday definitions include (1) the amount "paid or given or charged . . . for anything bought or taken in barter or for service rendered," (2) "loss, deprivation, or suffering as the necessary price of something gained or as the unavoidable result or penalty of an action," (3) "the expenditure or outlay of money, time, or labor," or (4) "an item of outlay incurred in the operation of a business enterprise (as for the purchase of raw

---

7. In this case, the commission authorized the "test period" for determining revenues and expenses beginning January 1, 2022, and ending December 31, 2022.

materials, labor, services, supplies) including depreciation and amortization of capital assets." *Webster's Third New International Dictionary* (2002).

{¶ 34} The third and fourth definitions indicate that in the business-enterprise context—the context most relevant here—"cost" means an amount spent to operate the business, and it includes depreciation and amortization expenses.[8] As explained above, after the Abandonment-and-Deferral Case, Duke Energy removed the remaining net book value of the propane caverns from its rate base, converted it into a regulatory asset, and reflected it as an expense on its books. We find it was neither unlawful nor unreasonable for the commission to characterize that portion of the deferred amount as a "cost" to the company, as it was an expense or outlay incurred to retire the caverns so they could be replaced by the pipeline.

{¶ 35} Second, it was not unlawful or unreasonable for the commission to consider expenses relating to retiring the caverns as a cost of "rendering the public utility service for the test period," R.C. 4909.15(A)(4). To support its contrary position, the OCC relies solely on *Office of Consumers' Counsel v. Pub. Util. Comm.*, 67 Ohio St.2d 153 (1981), which the OCC claims is "controlling in this case."

{¶ 36} In *Consumers' Counsel*, a public utility invested over $56 million in plans to construct four nuclear power plants but later canceled the project. *Id.* at 154. In the utility's distribution base-rate case, it sought to include its investment in the canceled plants as amortizable costs under R.C. 4909.15(A)(4). *Id.* at 161. The commission permitted it to do so, finding that the utility's plan to construct and

---

8. Although not raised by the parties, this definition would be consistent with R.C. 4909.151, which sets out costs that the commission *may* consider in fixing rates and which defines "costs" to include "operation and maintenance expense, depreciation expense, tax expense, and return on investment as actually incurred by the utility." The General Assembly did not provide a similar definition of "costs" in R.C. 4909.15. *See Ohio Water Serv. Co. v. Pub. Util. Comm.*, 61 Ohio St.2d 308, 310 (1980) (R.C. 4909.151 is not mandatory, so commission is not required to follow it in determining depreciation expense under R.C. 4909.15).

then its decision to cancel the nuclear plants had been prudent and therefore its expenditures should be recoverable in customer rates. *Id.* at 162-163.

{¶ 37} We reversed, holding that R.C. 4909.15(A)(4) did not permit the commission to transform an investment in capital assets into an ordinary operating expense "by commission fiat." *Id.* at 164. We interpreted R.C. 4909.15(A)(4) as "designed to take into account the normal, recurring expenses incurred by utilities in the course of rendering service to the public for the test period," such as "reasonable expenditures for repairs, maintenance, personnel-related costs, administrative expenses, and taxes." *Id.* We found that the losses sustained by the public utility in connection with its canceled nuclear plants were extraordinary and not ordinary operating expenses for the test period. Therefore, the commission's characterization of the utility's investment in the four canceled nuclear plants as a cost of rendering public-utility service under R.C. 4909.15(A)(4) was unlawful and unreasonable. *Id.*

{¶ 38} The OCC argues that similar to the facts in *Consumers' Counsel*, Duke Energy's retirement of the propane caverns was an extraordinary event and that any costs relating to that event were not normal, recurring expenses incurred by the company in rendering public-utility service for the test period.

{¶ 39} Our holding in *Consumers' Counsel*, however, depended on the fact that the nuclear plants were never constructed or placed into service. We emphasized that "what the company sought and what the commission granted was the amortization as service-related costs of an investment *that never provided any service whatsoever to the utility's customers*." (Emphasis added.) *Id.*, 67 Ohio St.2d at 164. In this case, Duke Energy used its propane caverns for over 60 years, including during a portion of the test period.

{¶ 40} We find that attempting to recover the costs associated with retiring outdated facilities that provided public-utility service for decades is fundamentally different than attempting to recover an investment in facilities that were never

constructed or put into service. As the staff report in the Abandonment-and-Deferral Case noted, "retirement of aging plant assets is naturally part of running a utility company" and therefore the expenditures relating to the retirement of the propane caverns are "not atypical []or infrequent."

{¶ 41} Moreover, since *Consumers' Counsel* was decided, we have clarified that recoverable costs under R.C. 4909.15(A)(4) are not strictly limited to recurring, everyday expenditures. Specifically, in *Duke Energy*, 2017-Ohio-5536, we rejected the argument that the company's costs to remediate its manufactured-gas-plant sites were not recoverable under R.C. 4909.15(A)(4). *Id.* at ¶ 19, 28-30. We acknowledged the statement in *Consumers' Counsel* that R.C. 4909.15(A)(4) was "'designed to take into account the normal, recurring expenses incurred by utilities,'" but we found the statement to be "dictum and not part of the holding." *Duke Energy* at ¶ 30, quoting *Consumers' Counsel* at 164. And we clarified that environmental-remediation costs were recoverable under R.C. 4909.15(A)(4) as a necessary and current cost of doing business as a public utility. *Id.* ¶ 9, 15.

{¶ 42} The rationale of *Duke Energy* applies here. Duke Energy's expenses relating to the retirement of its aging caverns were necessary and current costs of doing business as a public utility. Utility companies will inevitably retire outdated facilities to ensure safe and reliable service. Further, the legislature used open-textured language in R.C. 4909.15(A) requiring *the commission*, not this court, to fix and determine "just and reasonable rates" and determine the utility's cost in "rendering the public utility service for the test period." In such situations, we review the commission's exercise of its implementation authority for reasonableness. *See, e.g., Firelands Wind*, 2023-Ohio-2555, at ¶ 14-15; *In re Application of Alamo Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 16. It was reasonable for the commission to conclude that Duke Energy's expenses relating to replacing the outdated propane caverns with a pipeline constituted a "cost to the utility of rendering the public utility service for the test period," R.C. 4909.15(A)(4).

{¶ 43} In short, we find no error in the commission's refusal to apply the used-and-useful standard under R.C. 4909.15(A)(1). Nor has the OCC established that it was unlawful or unreasonable for the commission to conclude that the entire deferred amount was a cost of rendering public-utility service under R.C. 4909.15(A)(4). We therefore do not adopt the OCC's first proposition of law.

**C. We Need Not Decide the OCC's Remaining Propositions of Law**

{¶ 44} As noted above, the commission stated that even if the deferred amount were subject to the used-and-useful standard under R.C. 4909.15(A)(1), the caverns would properly be considered used and useful and therefore the deferred amount would be recoverable under that section. 2023 WL 7301331 at *10. In its second proposition of law, the OCC asserts that the commission's alternative finding was against the manifest weight of the evidence. But in light of our decision that the commission properly included the entire deferred amount as a cost of rendering public-utility service under R.C. 4909.15(A)(4), we need not consider arguments regarding the commission's alternative finding under R.C. 4909.15(A)(1). We therefore dismiss the OCC's second proposition of law as moot. *See In re Review of Alternative Energy Rider Contained in Tariffs of Ohio Edison Co.*, 2018-Ohio-229, ¶ 22; *In re Application of Columbus S. Power Co.*, 2014-Ohio-462, ¶ 39.

{¶ 45} In its third proposition of law, the OCC argues that the commission abused its discretion and acted unreasonably when it did not make the portion of the company's rates relating to the net book value of the propane caverns subject to refund pending a final decision by this court. This argument is not well-taken.

{¶ 46} "'It is well settled that this court will not reverse an order' of the [commission] 'unless the party seeking reversal shows that it has been harmed or prejudiced by the order.'" *In re Application of Ohio Power Co.*, 2020-Ohio-143, ¶ 34, quoting *In re Application of Ohio Power Co.*, 2018-Ohio-4697, ¶ 9. Even if the OCC were correct that the commission erred by not making any rates subject to

refund, the OCC has not shown harm because of that error. We have already determined that the commission properly included the entire deferred amount as a cost of rendering public-utility service under R.C. 4909.15(A)(4), and thus, no refunds are warranted. As a result, OCC cannot show prejudice for refunds not paid that were not warranted. Thus, OCC's arguments under its third proposition of law are purely hypothetical and are therefore not reviewable. *See, e.g.*, *In re Complaint of Cameron Creek Apts. v. Columbia Gas of Ohio, Inc.*, 2013-Ohio-3705, ¶ 33 (rejecting propositions of law when the appellant failed to show harm stemming from the commission's error); *State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 1998-Ohio-366, ¶ 8 (holding that abstract and hypothetical questions are inappropriate for judicial review).

## IV. CONCLUSION

{¶ 47} For the reasons explained above, the OCC has not established that the commission acted unlawfully or unreasonably by treating the deferred costs relating to the retirement of Duke Energy's propane caverns as a cost of rendering public-utility service under R.C. 4909.15(A)(4). Therefore, we affirm the commission's order.

Order affirmed.

_____

Maureen R. Willis, Ohio Consumers' Counsel, William J. Michael, Senior Counsel, and John Finnigan, John R. Varanese, and Alex R. Hickey, Assistant Consumers' Counsel, for appellant.

Dave Yost, Attorney General, John Jones, Section Chief, and Thomas G. Lindgren and Janet Gregory, Assistant Attorneys General, for appellee.

Rocco O. D'Ascenzo and Larisa M. Vaysman; and Taft Stettinius & Hollister, L.L.P., Elizabeth M. Brama, and Kodi J. Verhalen, for intervening appellee.

_____